IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELK ASSOCIATES FUNDING CORPORATION, 50 Jericho Quadrangle # 109 Jericho, New York  11753 | * * * |
| Plaintiff | * |
| v. | * |
| UNITED STATES SMALL BUSINESS ADMINISTRATION; and KAREN G. MILLS, in her capacity as Administrator of the United States Small Business Administration 409 3rd Street Southwest Washington, D.C.  20024 | * Case No. * * * |
| Defendants. | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT

The plaintiff, Elk Associates Funding Corporation, by its undersigned attorneys, hereby sues the United States Small Business Administration and its Administrator, Karen G. Mills, in her official capacity, for injunctive and declaratory relief and damages, and says:

## PARTIES

1.     The plaintiff, Elk Associates Funding Corporation ("ELK"), a New York corporation, is a Small Business Investment Company ("SBIC") licensed by the United States Small Business Administration ("SBA"), with its principal place of business located in Jericho, New York.  ELK is a wholly-owned subsidiary of Ameritrans Capital Corporation ("AMTC"), a Delaware corporation publicly traded on The NASDAQ Stock Market.  Both ELK and AMTC

are business development companies and governed by the Investment Company Act of 1940, as amended (the "1940 Act").

2.      The defendant, United States Small Business Administration, is an agency of the United States, operates nationwide and has its principal place of business in Washington, DC.

3.      The defendant, Karen G. Mills, is the Administrator of the SBA and is being sued solely in her official capacity as the Administrator of the SBA.

## INTRODUCTION

4.      ELK has been licensed as an SBIC since 1980.  In the thirty-two years it has been in existence, it has successfully used the SBA debenture program to fund countless small business projects that have benefitted the public.  Throughout its long history, ELK has never been accused by the SBA (or any other agency for that matter) of any serious impropriety or malfeasance.  Nor has ELK ever defaulted on any of its borrowings from the SBA, or is there any serious threat that ELK is in danger of defaulting on its next principal payment due the SBA, which is not due until October, 2012.

5.      The SBA, however, now seeks to terminate ELK's status as an SBIC.  In fact, it has special reasons for wanting to do so, although none of those reasons are appropriate under the statutory and regulatory scheme governing the SBA.

6.      As explained in more detail below, as a grandfathered, corporate SBIC, ELK enjoys special advantages not otherwise available to other SBICs.  Upon information and belief, the SBA has now concluded that because of such benefits enjoyed by ELK, the SBA is better off terminating ELK's status as an SBIC, and proceeding with any future SBIC on terms now generally available under its program.  In doing so, however, the SBA has threatened to deprive

and has deprived ELK of substantial property interests conveyed upon ELK in direct violation of the SBIC Program's statutory and regulatory scheme.

7.     Because of the SBA's arbitrary and capricious conduct, ELK is about to be placed or has been placed by the SBA in its SBIC Program's Office of Liquidation. Given the substantial and immediate harm suffered by ELK as a direct result of the SBA's actions – actions that inexorably will lead to ELK's liquidation and the loss of valuable property rights absent judicial intervention – ELK has brought this action for injunctive and declaratory relief and damages.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), the Declaratory Judgment Act, 28 U.S.C. § 1346(a)(2) (civil action against the United States), 5 U.S.C. §§ 701-706 (Administrative Procedures Act), and 15 U.S.C. § 634(b)(1) (SBA jurisdiction). This relief ELK requests is authorized by 28 U.S.C. §§ 2201 (Declaratory Relief) and 2202 (Injunctive Relief).

9.     The SBA's headquarters is located in Washington D.C., and Ms. Mills resides in her official capacity in the District of Columbia. Furthermore, a substantial part of the events and omissions giving rise to the claims in this case occurred in the District of Columbia. Therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## FACTUAL ALLEGATIONS

10.     Under the SBIC program, *see* 15 U.S.C. §§ 681 *et seq.*, a company is granted a license to operate as an SBIC, a private company which serves as a capital and information resource for small businesses. The SBA guarantees the SBIC's securities in the event that the SBIC fails, allowing the SBIC to better leverage capital investment.

A.    **ELK's Enjoys Special Advantages as a Corporate SBIC with Valuable**
      **Rights Grandfathered from its Being Licensed as an SSBIC.**

11.    ELK is a corporate SBIC which was organized and licensed under the predecessor

Specialized Small Business Investment Company ("SSBIC") program.  While ELK was

converted to an SBIC when the SSBIC program ceased to exist, ELK continued to operate under

the same license it had originally received in 1980.  Under this original license, ELK enjoys

certain attributes that new SBIC licensees are not able to obtain, including the ability to exist as a

perpetual-life corporate entity in possession of a license.  These attributes are important to the

corporate lending strategy ELK uses.  Unlike the structures now licensed through the SBA,

which have a limited life, ELK's perpetual license means it can become a constant source of

capital for small businesses by creating a loan portfolio of staggered maturities and continuing to

make new investments as loans mature or are re-financed.  Further, while ELK is a corporate

licensee, in recent years the SBA has refused to even issue licenses to corporate structures,

opting instead for limited-life partnerships.  These attributes make ELK's corporate-licensee

status more valuable than the SBA's currently favored limited-life partnership structure for

SBICs due to its perpetual life, and, more importantly, the implied ability to access the debenture

program repeatedly, as opposed to the limited debenture access of partnership SBICs.

12.    A second, important advantage ELK has by virtue of its grandfathered status

relates to its ability to borrow from banks.  Due to the terms of its existing license and certain

other agreements executed between ELK and the SBA, on the one hand, and ELK and certain

banks, on the other, ELK has the ability to utilize bank debt that is senior to the SBA

indebtedness.  These contractual arrangements, while customary at the time they were issued,

and specifically permitted by current applicable SBA regulations, are no longer entered into by

the SBA.  Further, ELK's agreements provide a "right of substitution," which permits ELK to

4

add and remove banks to the facility without SBA's prior approval. Given that SBA debentures are limited by statute to $150 million per SBIC, ELK is in a unique position in that, if it is able to find a lender to advance amounts above the $150 million limit, it can feasibly grow its portfolio to a much larger scale than other SBICs.

**B.     The SBA Refuses to Approve Legitimate Investments in ELK**

13.     The regulatory scheme governing SBICs provides that each SBIC must maintain a certain Capital Impairment Percentage ("CIP"). An SBA's CIP is calculated by adding the SBIC's realized losses and net unrealized depreciation and dividing the result by the SBIC's private capital. An SBIC is capitally impaired if its CIP exceeds permitted levels detailed in the regulations, and which vary depending on the proportion of equity investments made by the SBIC. ELK is considered in a position of Capital Impairment if its CIP exceeds 40 percent.

14.     If an SBIC becomes Capitally Impaired, then the SBA has the authority under the regulatory scheme to demand that the SBIC come into compliance. If compliance is not forthcoming, the SBA has authority pursuant to 13 C.F.R. 107.1810(g) and its own operating procedures, SOP Section 10.06.09.02, to refer the matter to the Office of Liquidation. Such authority is cabined, however, by two important limitations. First, the SBA is required by statute and its own SOPs, more specifically SOP Section 10.06.09.02, to provide the SBIC with an opportunity "to cure" the capital impairment. Second, under the same regulation, the SBA cannot take action against the SBIC without affording the SBIC notice and an opportunity to cure by issuing what is known as a "Right to Cure Letter."

15.     Only if both requirements are met – namely a right to cure has been effectively provided by the SBIC and adequate notice has been issued – can the SBA proceed against the SBIC by placing it in "liquidation." Indeed, these same limitations protecting a holder of a

government issued license are embedded in procedural rules governing all agencies under the Administrative Procedures Act. *See* 5 U.S.C. § 558(c).

16.     In 2009 and 2010, due to the state of the economy, the inability to access capital markets, and the performance of companies in its portfolio, ELK suffered operating losses that led to ELK becoming capitally impaired.  These operating losses were exacerbated as ELK underwent a full underwriting by the SBIC Investment Committee while waiting eleven months for its application for additional debentures to be processed and funded.  At the time, ELK's operating losses caused ELK's ratio of losses relative to its regulatory capital to slightly exceed the 40 percent maximum permitted CIP that ELK was permitted under the terms of its license.

17.     On July 20, 2010, the SBA informed ELK that its CIP exceeded the permissible limit by .10%, as it was 40.10%.  The SBA therefore "instructed [ELK] to cure its condition of Capital Impairment, no later than 15 days from the date on this letter." *See* Exhibit A.  The reference to "no later than 15 days from the date of this letter" to "cure" the position of Capital Impairment is not based on any statute or regulation.

18.     Notwithstanding, this small deficiency was capable of being cured by infusing an additional $40,000 into ELK.  ELK immediately notified the SBA of its intention to do so, and more specifically, advised the SBA in a letter dated August 3, 2010, that the $40,000 would be invested into ELK the next day. *See* Exhibit B.

19.     As represented, AMTC invested $40,000 into ELK on August 4, 2010.  This investment brought ELK's CIP to below 40 percent.  ELK also filed a new certificate with the SBA, attesting to its compliance with the capital requirements.  A copy of the new Capital Certificate is attached as Exhibit C.

20.     No objection to ELK's cure or ELK's certificate was voiced by the SBA.   Nor did the SBA advise ELK that the $40,000 investment was inadequate in any way to satisfy the SBA's concerns about the Capital Impairment issue that had been raised in the SBA's July 20, 2010, letter.

21.     Accordingly, as of August 4, 2010, ELK was in Capital Compliance.

22.     Following the events in August, 2010, in which ELK was by all accounts in Capital Compliance, ELK found itself in need of additional capital so that its CIP would continue to meet or fall below 40 percent.  Because ELK is wholly owned by AMTC, the only way for that capital to be invested in ELK was for AMTC to obtain investments, which AMTC would then immediately transfer to ELK.

23.     AMTC was successful in its efforts to find qualified investors who believed that AMTC and ELK were good investments.  But the SBA refused to approve these investments in AMTC, which would have allowed ELK to easily cure its position of Capital Impairment and return to active lending.  The SBA's refusal to approve the transactions brought to it by AMTC and ELK was arbitrary and capricious and motivated by the SBA's desire to remove ELK from the SBIC program.  The SBA's actions also make no sense in light of the fact that AMTC has enjoyed significant success and has consistently had multiple parties vying for the opportunity to invest in AMTC and ELK (see pages 7-12 of AMTC's May 23, 2011, Proxy Statement detailing the competitive "auction" process used to secure investors, attached as Exhibit D), many of which remain willing to invest if given the time and opportunity to do so and if the improper roadblocks to investment placed in ELK's path by the SBA are removed.

**The CN Transaction**

24.     Beginning in the summer of 2010, ELK sought potential investors. After meeting

with approximately twenty potential investors, ELK decided to enter into an exclusivity

agreement and term sheet with Bounty Investments, LLC ("Bounty"), an investment company

wholly owned and managed by Columbus Nova Partners, LLC ("CN"), a privately held New

York-based investment management firm that manages over $10 billion in assets. For ease of

reference, Bounty and CN are collectively referenced herein as "CN." ELK submitted the

structure of the proposed AMTC – CN transaction (the "CN Transaction") to the SBA in

February 2011. The purpose of this submission was to engage in a productive process of

insuring that the SBA was comfortable with the proposed transaction before AMTC and CN

entered into definitive documentation. A copy of ELK's February 8, 2011, submission to the

SBA is attached as Exhibit E.

25.     The CN Transaction, as initially proposed pursuant to the term sheet, provided

that CN would invest $60 million in AMTC, with at least $25 million of that investment being

cash and the remainder consisting of various investment securities. The term sheet also provided

for CN to endeavor to purchase up to an additional $25 million in AMTC common stock in the

year following the closing of the CN transaction at prices to be mutually agreed upon by the

parties. After CN's investment in AMTC closed, AMTC was to immediately transfer funds to

ELK to cure ELK's position of Capital Impairment.

26.     Between March and the end of April 2010, representatives of ELK and of the

SBA communicated concerning the CN Transaction, without any major issues being raised by

the SBA about the deal. On April 14, 2011, AMTC and CN entered into a stock purchase

agreement and relayed definitive documentation for the CN Transaction and publicly announced

the proposed investment.  Pursuant to the definitive stock purchase agreement, CN would

acquire up to $65 million of AMTC common stock for cash.  Pursuant to the stock purchase

agreement, $25 million was to be invested at the initial closing and additional amounts of

between $35million and up to $40 million were to be invested from time to time during the two-

year period following the initial closing subject to the satisfaction of the terms and conditions set

forth in the stock purchase agreement.  Following the announcement, AMTC common stock

immediately appreciated more than 40 percent to a price approximately equal to the transaction.

On May 10, 2011, AMTC filed preliminary materials with the Securities and Exchange

Commission ("SEC") and after review by the SEC, filed definitive proxy materials on May 23,

2011.  The definitive proxy materials were disseminated to shareholders shortly thereafter.

     27.     On June 24, 2011, AMTC's shareholders approved the CN transaction at a special

meeting of shareholders.  The parties thereafter prepared for a June 30, 2011 closing, subject to

receipt of SBA approval for the CN Transaction prior to that date.

     28.     The SBA's Investment Committee scheduled a meeting with ELK for June 28,

2011, to discuss the CN Transaction.  On the eve of the meeting, however, the Investment

Committee suddenly and inexplicably canceled the meeting.

     29.     On July 15, 2011, six months after the SBA received notice of the proposed CN

Transaction and after ELK had already signed definitive agreements with CN, the SBA for the

first time claimed it had concerns about the CN Transaction; it asserted that the CN Transaction

might violate the SBIC program's Management-Ownership Diversity ("MOD") requirement.

The SBA claimed that because of its investment in AMTC, CN would indirectly own more than

70 percent of ELK's Regulatory and Leverageable Capital, and thus refused to approve the CN

Investment.

30.     The SBA's opinion concerning the MOD requirement was arbitrary and capricious and violated its own regulations. Pursuant to SBA regulations, an investor may not own and control more than 70 percent of an SBIC. 13 C.F.R. § 107.150(b)(1). But the same regulation also provides that "[a]n investor that is a traditional investment company, as determined by SBA, may own and control more than 70% of your Regulatory Capital and Leverageable Capital." 13 C.F.R. §107.150(b)(1).

31.     AMTC meets the regulation's definition of a traditional investment company because (1) it is governed by the SEC under the 1940 Act and the Exchange Act, (2) AMTC's shares are publicly traded on NASDAQ, and (3) AMTC complies with all of the corporate governance requirements under NASDAQ regulations. As such, under the SBA's regulations, the MOD requirement should have been found by the SBA to have been satisfied.

32.     This and other factors supporting the deal were explained to the SBA, yet the SBA never provided any contrary opinion or explained why its MOD analysis had any validity.

33.     During July and August 2011, ELK provided further information to the SBA about the CN Transaction and its president and chief executive officer, Michael Feinsod ("Feinsod") (who holds the same positions with AMTC) and other principals had meetings with members of the Investment Committee and Sean Greene, Associate Administrator for Investment and Special Advisor for Innovation, to attempt to resolve the SBA's issues. Despite ELK's efforts, in September 2011, the SBA denied ELK's proposed transaction with CN, without addressing any of ELK's or its attorneys' legal arguments. *See* email from Paul Salgado ("Salgado"), Area III Chief of the SBA's Investment Division, Office of SBIC Operations, to Feinsod, dated September 19, 2011, and attached undated letter, attached as Exhibit F. This decision, at best, was based on the SBA's incorrect view of the MOD regulations, or, at worst,

was motivated by a desire to put ELK into liquidation, using the MOD regulations as an excuse. In either event, the SBA's actions were arbitrary and capricious.

34.     ELK spent the next two months and significant time and resources addressing the SBA's purported concerns by restructuring the proposed CN Transaction and bringing in new third-party investors such that there could be no MOD issue, regardless of the SBA's interpretation.

35.     In November 2011, ELK presented the restructured transaction, which now brought CN's ownership well below 70 percent and within the percentage required by SBA regulations. The SBA responded with additional information requests, to which ELK promptly responded with detailed charts explaining how the proposed structure complied with all the MOD requirements.

36.     In December 2011, the SBA again denied ELK's proposed CN Transaction as proposed to be revised, providing a significantly flawed analysis. The SBA again used MOD as the key issue, but failed to cite to any specific legal reasons for its position. Additionally, at no time did the SBA contact ELK or its counsel to offer an opportunity to clarify ELK's position as to compliance.

37.     Thereafter, needing to cure its capital impairment, and recognizing that the SBA would never approve the CN Transaction, ELK abandoned the CN Transaction. ELK then held discussions with more than seven institutional investors and decided to pursue a transaction with a publicly traded business development company.

### The BDC Investor Transaction

38.     On February 2, 2012, ELK submitted a term sheet and detailed presentation to the SBA explaining its new proposed transaction with a publicly traded business development

11

company (the "BDC Investor"), which, due to a nondisclosure agreement between ELK and the BDC, is referred to herein as the "BDC Investor Transaction." Because the path taken in seeking approval of the CN transaction after a final deal had been negotiated and memorialized had not only been time-consuming, but also exceedingly costly, ELK sought to have the SBA approve the BDC Investor Transaction before ELK proceeded with the transaction.

39.     ELK provided the SBA with ample information about the BDC Investor Transaction, including responding to requests for additional information. The SBA, however, refused to approve the BDC Investor Transaction, providing various explanations for the denial, each of which was more baseless than the next.

40.     It is apparent from the reasons offered by the SBA for refusing to proceed with the BDC Investor Transaction that the SBA was not dissatisfied with the terms of the transaction, but rather had initially taken the position that any investment in ELK would be rejected. First, in a voicemail on February 16, 2012, Salgado informed Feinsod that the Investment Committee decided not to engage in or allow ELK to move forward with the BDC Investor Transaction, claiming that the primary reason was that "they [the committee] could not understand why the [BDC Investor] would want to get an SBA license by acquiring a distressed SBIC." Consistent with this flawed reasoning, the SBA sent an email to ELK on February 21, 2012, contending that it could not understand why anyone, including the BDC Investor, would want to invest in ELK. Based on that reasoning, the SBA made clear that it would not approve any investor.

41.     Second, the SBA made clear that its real concern with the BDC Investor was that it conflicted with its view that the SBA was more desirous of liquidating ELK, rather than allowing it to maintain its CIP. Salgado noted in the same February 16, 2012, voicemail that the Investment Committee felt that in the long run the investment would not be "beneficial" to the

SBIC or the SBA. Evidence that the SBA was actually satisfied with the BDC Investor was reflected in the SBA's statements on its voicemail that the BDC Investor was welcome to apply directly to the SBA for an SBIC license.

42.     Salgado's voicemail demonstrated that the SBA was not only substituting its own business judgment for that of a public investor, but that its real motivation was to preclude ELK from curing its position of Capital Impairment. The SBA provided nothing in the way of legal or regulatory reasons for the BDC Investor Transaction's disapproval.

43.     On February 21, 2012, Salgado confirmed to ELK that, because ELK had not cured its position of Capital Impairment, "the Office of SBIC Operations will be recommending that ELK be transferred to the Office of Liquidation." *See* email from Salgado to Feinsod, dated February 21, 2012, attached as Exhibit G. On that same date, Feinsod was informed in a telephone conversation by Salgado that ELK was being placed in liquidation due to its position of Capital Impairment. No Right to Cure Letter had been issued to ELK by the SBA, and, even more important, the SBA had deprived ELK of any ability to cure its position of Capital Impairment by arbitrarily and capriciously refusing to approve any investments in ELK. As the SBA well knew, the net result of its own actions had been to force ELK to exist in a state of Capital Impairment.

44.     The arbitrary and capricious nature of the SBA's actions were confirmed when, on February 22, 2012, the SBA emailed ELK a letter (which was faxed to ELK two days later) stating new "reasons" why the SBA was unable to approve the BDC Investor Transaction. A copy of this letter is attached as Exhibit H. The reasons given in the letter were entirely different than from those previously provided by the SBA to ELK. Although the SBA now claimed for the first time that a $10 million capital infusion in ELK "will not have a lasting positive effect"

on ELK's financial condition given its deterioration and "maturing Debenture leverage within

the next 12 months," that statement was baseless and unsupported by any evidence or analysis.

The SBA also claimed, again with no factual basis, that issues it had raised in an earlier letter to

ELK concerning the BDC Investor Transaction had not been satisfactorily addressed by ELK.

Those statements were false.

45.     On February 22, 2012, in response to Salgado's earlier letter, Feinsod sent

Salgado an email in which he advised the SBA that it was apparent that the SBA would not

approve any transaction involving an investment in ELK, as the SBA was clearly attempting to

remove ELK as a grandfathered corporate licensee. *See* email from Feinsod to Salgado, attached

as Exhibit I. Feinsod informed the SBA that ELK was abandoning the single investor capital

raise approach (which requires SBA approval because it would involve a change of control or

ownership of ELK under SBA regulations) and would be engaging in a capital raise of at least

$10 million with multiple investors, which would (1) not require SBA approval and (2) cure

ELK's Capital Impairment issue. He also informed Salgado that no Right to Cure Letter had

issued and thus that it was improper for ELK to be referred to the Office of Liquidation.

Demonstrating the utmost bad faith and arbitrary and capricious conduct, on the next day,

February 23, 2012, Salgado left Feinsod another voicemail, this time confirming that the SBA

was transferring ELK from the Office of Operations to the Office of Liquidation.  Salgado and

the SBA knew that the transfer of ELK to the Office of Liquidation would be disastrous for ELK

and would destroy any hope of ELK's curing the capital impairment and of existing in its present

form.  That is because to emerge from the Office of Liquidation, "the licensee must demonstrate

viability and meet the licensing standards in effect at the time of the proposed transfer back to

the" Office of SBIC Operations. *See* SBIC Liquidation, Office of SBIC Liquidation, U.S. Small

Business Administration, SOP 10 07 1 at 35-36, (Dec. 21, 2007).

46.     The SBA has not granted an SBIC license to a corporation since 2002 and has

specifically stated that "SBA generally prefers that SBICs have a planned 10-15 year lifespan,

rather than an evergreen or indefinite life structure."

47.     On February 29, 2012, Harry Haskins, the Deputy Associate Administrator of the

SBA's Investment Division, told Feinsod that it was the SBA's view that the Right to Cure

Letter sent by the SBA to ELK in July 2010 could be used to support the SBA's position that

ELK had failed to cure its position of Capital Impairment after being given notice to do so by the

SBA.  Any such contention that this letter, sent more than one and one-half years earlier,

sufficed as the Right to Cure Letter, was contrary to the facts known to the SBA.  It was also

legally deficient to satisfy the obligation on the part of the SBA.

**C.      The SBA Ultimately Issues a Right to Cure Letter, but then Renders the
          Letter Worthless and also Makes it Effectively Impossible for ELK to Cure
          its Position of Capital Impairment.**

48.     Ultimately, after being threatened with litigation to force it to issue a Right to

Cure Letter, and having no way around issuing such a letter, the SBA sent a Right to Cure Letter

to ELK on March 6, 2012.  A copy of the letter is attached as Exhibit J.  The letter directed ELK

to cure its position of Capital Impairment within fifteen days, and stated that if ELK failed to do

so, the SBA "may avail itself of any all legal remedies available to it under Section 107.1810(g)

of the Regulations, which include declaring [ELK's]total indebtedness to SBA immediately" and

or instituting receivership proceedings.  The letter also stated that the SBA would "suspend

liquidation activities for a period of 15 days from the date of this letter to allow the Licensee an

opportunity to cure its condition of Capital Impairment to SBA's satisfaction."

49.     On March 8, 2012, ELK informed the SBA through email that, while it disagreed with some of the positions taken by the SBA in the March 6, 2012, Right to Cure Letter, it wanted to move beyond those issues and focus on raising capital. ELK advised that significant interest existed in financing AMTC's recapitalization, which is a necessary predicate to investing in ELK. That is because, as with all BDC-owned SBICs, because ELK is wholly owned by AMTC, investors must first invest in ELK's parent, AMTC, before funds from AMTC can then be invested in ELK. ELK further advised that it planned on delivering binding commitment letters from investors to the SBA prior to March 21, 2012. *See* email from Feinsod to Salgado, dated March 8, 2012, attached as Exhibit K.

50.     In response, the SBA sent a letter to ELK on March 13, 2012, that demonstrates that the March 6, 2012, Right to Cure Letter previously issued was effectively worthless as it did not provide ELK with a genuine right to cure. A copy of the SBA's March 13, 2012, letter is attached as Exhibit L.

51.     In its letter, the SBA stated that it would be applying an SBA TechNote, entitled *Guidelines Concerning Debenture Applicants Structured as Business Development Company or BDC Subsidiary* (TechNote 13), which is applicable to new licensees only, to examine whether ELK had raised sufficient regulatory capital. According to the SBA, although this contention is concerning the right of a BDC-owned SBIC to cure its position of Capital Impairment cannot be found in the applicable regulations, commitment letters from institutional investors to invest in AMTC would not be sufficient to satisfy the SBA, but rather, the subscriptions by investors would have to close and be funded before March 21, 2012, for ELK to be considered in compliance.

52.     Under the SBA's position, were ELK a standalone SBIC, it would only have to provide the Investment Division with commitment letters that met the Investment Division's requirements to cure its Capital Impairment. But the SBA required that AMTC actually raise from $10 million to $15 million in actual funds before March 21, 2012. That was effectively impossible, because, among other reasons, AMTC is a NASDAQ-listed public company and would require prior notice to shareholders and shareholder approval in order to approve any practical infusion of capital. In addition, given the uncertainties created within investors by the SBA's March 6, 2012, letter, no investor would invest in ELK.

53.     Among other things, the SBA's March 13, 2012, letter also could be read as if the SBA was requiring AMTC to satisfy items 1(a) or 1(b) of TechNote 13 (requiring BDCs to have funded net worth far greater than their capital commitment to the SBIC). Items 1(a) and (b) of TechNote 13 require a BDC starting up a newly-licensed SBIC to have either six or ten times the amount needed to be licensed. Those items should have no bearing whatsoever on determining whether an SBIC that is a going concern has cured its position of Capital Impairment.

54.     In response to the SBA's March 13, 2012, letter, on March 14, 2012, ELK sent the SBA a letter pointing out the myriad problems with the SBA's position. A copy of ELK's letter is attached as Exhibit M. ELK again informed the SBA that AMTC was "planning to provide binding commitment letters from qualified investors "in an amount sufficient to cure ELK's position of Capital Impairment." ELK also advised that the commitment letters would state that all investments in AMTC would immediately be invested in ELK. Because going to investors with the conditions in the SBA's March 13, 2012, letter would destroy ELK's ability to raise funds from investors, ELK asked the SBA to revisit and clarify its position. ELK also

asked for additional time to cure, given that the SBA's position taken in the March 13, 2012,
letter had effectively kept it from going to the market to raise funds.

55.     On March 19, 2012, Haskins sent Feinsod a letter that again repeated the SBA's
position that although liquidation activities had been suspended, the "cure period" ends 15 days
from SBA's March 6, 2012 letter or on March 21, 2012. *See* letter from Haskins to Feinsod,
attached as Exhibit N. The SBA took the position in Haskin's letter that commitment letters from
qualified investors to invest in AMTC would not qualify as a cure acceptable to the SBA, and
that only a large "cash infusion" in ELK would be viewed as a cure of ELK's position of Capital
Impairment. *Id.*

56.     ELK has been wronged by the SBA's inadequate and unfair process, specifically
the SBA's arbitrary and capricious decision making and failure to follow its own regulations and
procedures concerning the Right to Cure Letter and what is required of an SBIC to cure a
position of Capital Impairment. The SBA has placed roadblocks before ELK's fundraising
attempts at every turn, thereby depriving ELK of its property rights in violation of the Due
Process Clause of the United States Constitution.

57.     The SBA has acted arbitrarily, capriciously and contrary to law by construing
the regulations as allowing an SBIC attempting to cure a capital deficiency a maximum of 15
days within which to cure the default. Instead, from the plain meaning of 13 CFR
107.1810(2)(g)(i), an SBIC is entitled to a minimum of 15 days to cure up to the amount of time
dictated by commercial reasonableness and the circumstances of the particular case. SBA
Standard Operating Procedure 10.06 states specifically that the "SBA has not established
specific time limits to resolve violations because prudent business judgment is required. . . ."

The same SOP states further that all that must be done by the SBIC within 15 days is that it develop a "Capital Impairment Resolution Plan", which Elk has done.

58.     Contrary to law and its own SOP, the SBA has formalized a "Standard Cure Letter" which sets a maximum period of 15 days within which to cure a capital impairment. This arbitrary application of the time set by 13 CFR 107.1810(2)(g)(i), which requires that the SBA provide the SBIC with "at least" 15 days to cure is contrary to prudent business judgment and, in this instance, impossible for Elk to accomplish, particularly in light of the SBA's history of rejecting viable plans to source capital and to come into compliance.

59.     That no real opportunity to cure has been provided to ELK is of critical importance here. If an SBIC is sent a Right to Cure Letter and does not resolve the issue, then the SBIC may be referred the Office of Liquidation. Transferring ELK to the Office of Liquidation will destroy ELK as (1) ELK will not be able to raise funds to cure its position of Capital Impairment, and (2) even if ELK raises the funds necessary to cure its position of Capital Impairment (which ELK understands has not happened for any SBIC that has been sent to the Office of Liquidation) and thus be permitted to be transferred back to the Office of Operation, it will no longer be a grandfathered SBIC with all of the benefits attended to grandfathered status.

60.     The SBA's conduct described above was not only arbitrary and capricious, it was contrary to the regulations governing the SBA, and indeed, the statutory scheme governing all agencies. *See* 5 U.S.C. 558(c).

## Count I
### (To Set Aside the Decision of the SBA Pursuant to 5 U.S.C. § 706)

61.     ELK hereby incorporates paragraphs 1 to 60 as if fully set forth herein.

62.     5 U.S.C. § 706 provides a federal court with the authority to "hold unlawful and set aside SBA action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

63.     As demonstrated above, the SBA acted in an arbitrary and capricious manner by not following its own regulations and SOP, as well as the Administrative Procedure Act, which required the SBA to provide ELK with notice of any deficiency under its CIP.

64.     The SBC acted in an arbitrary and capricious manner by failing to give ELK a legitimate opportunity to cure its position of Capital Impairment.

65.     More specifically, the SBA's actions in making it effectively for ELK to cure its position of Capital Impairment violated:

      a.   the regulatory scheme, 13 C.F.R. 107.1810(g)(2), which governs the SBA's conduct, and which provides that the SBA may take action only if it has "given [the SBIC] at least 15 days to cure the deficiency."

      b.   the SBA's SOP, Section 10 06, which has the force of law.

      c.   the APA, 5 U.S.C. § . 558(c), which requires "notice by the SBA in writing of the facts or conduct which may warrant the action [here, of referring ELK to the Office of Liquidation].

66.     Additionally, the SBA acted in an arbitrary and capricious manner, and not in accordance with law, by (1) refusing to approve the CN and BDC Investor Transactions, and (2) refusing to allow ELK to go to the market to raise additional capital in a manner that would not require SBA approval.

67.     As a result of each of the decisions and final SBA actions of the SBA identified above, ELK will suffer irreparable injury.  It will be forced into liquidation, thereby no longer

existing as a viable entity, and also will lose the valuable property rights it holds as a corporate grandfathered SBIC.

68.     The Court, therefore, should (1) hold the SBA's conduct to be unlawful, (2) require a new Right to Cure Letter with a commercially reasonable time for ELK to present a plan to be issued to ELK by the SBA to cure its position of Capital Impairment, (3) require the SBA to accept legitimate commitment letters from qualified investors in AMTC as a cure to ELK's position of Capital Impairment, as long as those letters guaranty that the funds identified in the commitment letters are transferred by AMTC to ELK immediately upon closing, and (4) set aside the SBA's decision to transfer ELK to the Office of Liquidation.

WHEREFORE, the plaintiff, ELK Associates Funding Corporation, hereby respectfully prays that this Court (1) require the SBA to issue ELK a right-to-cure letter providing ELK with a commercially reasonable period to present to the SBA commitment letters reflecting sufficient funds to bring ELK's CIP to 40 percent or lower once the funds received pursuant to the commitment letters are transferred by AMTC to ELK; (2) set aside the SBA's decision to transfer ELK to the Office of Liquidation; and (3) grant ELK all relief that is just and proper.

## Count II
### (Declaratory Judgment)

69.     ELK hereby incorporates paragraphs 1 to 68 as if fully set forth herein.

70.     As stated above, there exist actual controversies of justiciable issues between the parties within the jurisdiction of this Court, involving the rights and liabilities of the parties. Pursuant to 28 U.S.C. § 2201 the Court has the authority to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

71.     An actual controversy exists on the issue of whether the SBA was required to send a Right to Cure letter concerning ELK's capital impairment position, pursuant to 13 C.F.R. 107.1810(g)(2), before beginning the process of sending ELK to the Office of Liquidation.

72.     An actual controversy exists on whether the SBA was entitled to impose all of the positions that it imposed on ELK's right to cure its position of Capital Impairment as described above.

73.     An actual controversy exists on the issue of whether the SBA can transfer ELK to the Office of Liquidation and thereby deprive ELK of the benefits it possesses as a grandfathered corporate SBIC.

74.     An actual controversy exists concerning whether ELK should be given time to raise additional capital given that the SBA's arbitrary and capricious conduct and actions, not in the interest of the public and in violation of law, prevented ELK from raising capital in the past that, had the SBA acted properly, would have cured ELK's position of capital impairment.

WHEREFORE, the plaintiff, ELK Associates Funding Corporation, respectfully prays that this Court issue a Declaration (1) declaring that the SBA is required to issue ELK a right to cure letter presenting ELK with a commercially reasonable period to present to the SBA commitment letters reflecting sufficient funds to bring ELK's CIP to 40 percent or lower once the funds received pursuant to the commitment letters are transferred by AMTC to ELK; (2) setting aside the SBA's decision to transfer ELK to the Office of Liquidation, and (3) granting ELK all other relief that is just and proper.

## Count III
### (Violation of Due Process)

75.     ELK hereby incorporates paragraphs 1 to 74 as if fully set forth herein.

76.     13 C.F.R. 107.1810(g)(2) requires notice and an opportunity to cure any capital impairment. As described above, the SBA did not provide such notice to ELK.

77.     In addition, the Fifth Amendment to the United States Constitution provides that no one shall be "deprived of life, liberty or property without due process of law." By destroying the value of ELK's license, refusing to approve investments in AMTC that would have led to ELK's not being in a capitally impaired position, and causing ELK to be placed with the Office of Liquidation, the SBA has caused the destruction of ELK and thus ELK to lose a valuable property right.

WHEREFORE, the plaintiff, ELK Associates Funding Corporation, demands that it be awarded damages against the defendant, United States Small Business Administration, in an amount to be determined at trial, but in excess of $60,000,000, plus that it be awarded its costs, attorneys' fees, and all other relief that is just and proper.

**Count IV**
**(Injunctive Relief)**

78.     ELK hereby incorporates paragraphs 1 to 77 as if fully set forth herein.

79.     For the reasons stated above, ELK is entitled to temporary, preliminary and permanent injunctive relief to prevent the SBA from sending ELK to the Office of Litigation and to permit ELK sufficient time to raise capital to cure its capital impairment position. ELK is likely to succeed on the merits of its claims because, as described above, the SBA failed to comply with its own regulations and acted in an arbitrary and capricious manner.

80.     It is a certainty that ELK will suffer irreparable harm should the relief sought not be granted as ELK will cease to exist.

81.     The balance of equities is in ELK's favor because ELK has already proven that it cured the issue of capital impairment in August of 2010, and that the SBA's March 6, 2012 Right

to Cure Letter, as amended by the SBA's March 13, 2012, letter, imposed arbitrary and capricious restrictions that destroyed ELK's ability to cure its position of Capital Impairment.

82.     An injunction is in the public interest because the SBA should not be permitted to flaunt its own regulations in order to eliminate ELK because in the time period since ELK became an SBIC, the SBA has changed its focus regarding short-term versus long-term SBICs. But for the SBA's actions concerning the two transactions that required SBA approval that were turned down without any justification, ELK would have raised more than sufficient funds to remove any capital impairment percentage and to continue as a successful SBIC. ELK needs additional time now to raise funds in a manner that will not require SBA approval, as it would have been able to do in the past had it known that the SBA would have refused, for arbitrary, capricious and baseless reasons, to refuse to approve any investment that required the SBA's approval. Granting ELK the additional time it seeks will have no detrimental effect on the SBA; denying ELK the relief it seeks will drive ELK out of business.

83.     Injunctive relief therefore is appropriate in order to prevent ELK from being driven out of business by the SBA while this matter is being litigated.

WHEREFORE, the plaintiff, ELK Associates Funding Corporation, respectfully prays that this Court enter a Temporary, Preliminary, and Permanent Injunction: (1) requiring the SBA to issue ELK a right to cure letter presenting ELK with a commercially reasonable period to present to the SBA commitment letters reflecting sufficient funds to bring ELK's CIP to 40 percent or lower once the funds received pursuant to the commitment letters are transferred by AMTC to ELK; (2) keeping ELK within the supervision of the Office of SBIC Operations and not permitting a transfer to the Office of Liquidation and/or suspending any actions by the Office

24

of Liquidation, until the termination of this litigation; and (3) granting ELK all other relief that is just and proper.

<strong><u>Count V</u></strong>
<strong>(Attorneys Fees and Costs Pursuant to the Equal Access to Justice Act)</strong>

84.     ELK hereby incorporates paragraphs 1 to 83 as if fully set forth herein.

85.     The award of costs and attorneys fees is proper pursuant to 5 U.S.C. § 504 and 28 U.S.C. § 2412, because the SBA's conduct was arbitrary and capricious, the SBA has acted in bad faith, and because the position of the SBA in defending the SBA's actions while seeking to deprive ELK of its grandfathered status is without substantial justification.

WHEREFORE, the plaintiff, ELK Associates Funding Corporation, respectfully requests that this Court award it costs and attorneys fees as the prevailing party in this litigation.

Dated:  March 20, 2012

William S. Heyman (Bar No. 473451)
Kenneth C. Gauvey (Bar No. 982088)
Don P. Foster (*Pro Hac Vice pending*)
Offit Kurman, P.A.
8171 Maple Lawn Blvd. #200
Fulton, Maryland 20759
301-575-0393
Fax: 301-575-0335
wheyman@offitkurman.com
kgauvey@offitkurman.com
dfoster@offitkurman.com

*Attorneys for Plaintiff,*
*ELK Associates Funding Corporation*

<strong><u>JURY TRIAL DEMAND</u></strong>

Plaintiff hereby demands a jury trial for all claims that may be tried before a jury.