**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ELK ASSOCIATES FUNDING
CORPORATION,

      Plaintiff,

      v.

UNITED STATES SMALL BUSINESS
ADMINISTRATION, and

KAREN G. MILLS, Administrator of the
United States Small Business
Administration,

      Defendants.

Civil Action No. 12-00438 (CKK)

**MEMORANDUM OPINION**
(April 24, 2012)

      Elk Associates Funding Corporation ("ELK") brings this action against the United States

Small Business Administration (the "SBA"),[1] seeking relief under the Administrative Procedure

Act and the Due Process Clause of the Fifth Amendment to the United States Constitution for the

SBA's allegedly arbitrary and capricious conduct.  Currently before the Court is ELK's [3]

Motion for Preliminary Injunction and Temporary Restraining Order ("Motion for Preliminary

Relief").[2]  Upon consideration of the parties' submissions, the relevant authorities, and the record

as a whole, ELK's Motion for Preliminary Relief shall be DENIED.

---

[1] To be precise, ELK names both the SBA and its Administrator as defendants.  Because no party suggests
that there is a material difference between the SBA and the Administrator for purposes of the Court's analysis, the
Court shall, for purposes of convenience, simply refer to both defendants as "the SBA."

[2] The Court denied ELK's Motion for Preliminary Relief insofar as it sought a temporary restraining order
on March 21, 2012.  *See infra* Part II.C.

## I.  OVERVIEW

Since 1980, ELK has been licensed to operate as a Small Business Investment Company ("SBIC") under the auspices of the SBA.  Over the years, it has received substantial financial assistance from the SBA and, today, ELK has more than $21 million in outstanding debt obligations that are held directly by the SBA.

Beginning in March 2010, as a result of mounting losses, the condition of ELK's private capital had deteriorated to such a point that the company no longer met the minimum threshold set by regulation—a "condition of capital impairment" that triggered an event of default with an opportunity to cure.  On July 20, 2010, the SBA notified ELK that it was in default and warned the company that it had a period of fifteen days to cure its condition of capital impairment.  On August 4, 2010, ELK received a modest cash infusion, but because its financial condition had further deteriorated by that point, the cash infusion failed to cure the company's condition of capital impairment.  In the months that followed, ELK pursued a variety of transactions with third-party investors in an attempt to secure the private capital needed to come into compliance with the applicable regulations.  In the end, none of those transactions came to fruition and ELK's financial condition only continued to further deteriorate.  On February 22, 2012, more than one year and seven months after ELK was notified that it was in default and needed to cure its condition of capital impairment, the SBA internally transferred the company to a unit responsible for the orderly liquidation of SBICs.

Thereafter, faced with ELK's threats of litigation, the SBA voluntarily agreed to suspend all further liquidation activities and, on March 6, 2012, the SBA issued ELK a second formal notice of its condition of capital impairment, reiterating that the company was in default and

warning that it had a period of fifteen days to cure.  On March 13, 2012, after ELK proposed submitting certain unfunded commitment letters as a proposed cure, the SBA provided ELK with a letter identifying potential problems with the company's proposed approach.

Claiming that the SBA had imposed unreasonable conditions on its ability to cure, ELK failed to submit the proposed commitment letters to the SBA within the fifteen-day period or, for that matter, at any time thereafter.  Instead, ELK commenced this action on March 20, 2012, seeking relief under the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment for the SBA's allegedly arbitrary and capricious conduct.  After the action was filed, the SBA voluntarily agreed to refrain from engaging in further liquidation activities involving ELK until and including April 25, 2012, preserving the status quo until then and affording ELK even more time to cure its condition of capital impairment.

ELK now comes to this Court seeking the extraordinary relief of a preliminary injunction, claiming that the SBA acted arbitrarily and capriciously by failing to provide the company with sufficient notice of its condition of capital impairment or a meaningful opportunity to cure. Everything in the record bespeaks to the contrary.  The case comes to the Court after ELK has already been provided formal notice of its condition of capital impairment on two occasions and it is undisputed that ELK continues to have a condition of capital impairment to this day. Despite having more than one year and nine months to do so, ELK has not cured its condition of capital impairment nor has it presented this Court with any credible evidence that it can realistically do so.  In fact, ELK's condition of capital impairment has only worsened over time.

3

On the record presented,[2] the Court concludes that ELK has failed to carry its burden of showing a likelihood of success on the merits.  Furthermore, even assuming that ELK will suffer some irreparable harm absent a preliminary injunction, the Court finds that the balance of the equities weigh against the issuance of an injunction.  Accordingly, considering the record as a whole, ELK's Motion for Preliminary Relief shall be DENIED.

## II. BACKGROUND

### A.    Statutory and Regulatory Background

Under the Small Business Investment Act, the SBA is empowered to license private companies, including, at the time of ELK's licensing, corporations, as SBICs.  *See* 15 U.S.C. § 681(c).  To encourage the formation and growth of SBICs, Congress authorized the SBA to provide financial assistance to SBICs by matching up to 200%, and in some cases 300%, of an SBIC's qualifying capital commitments and investments.  *See id.* § 683(b).  This financial assistance, which generally occurs by the SBA's purchase or guaranty of an SBIC's debentures[3] or participating securities, is known as "leverage."  *See id.*; 13 C.F.R. § 107.50.  SBICs, in turn, use this low-cost, government-guaranteed capital to make investments in small businesses throughout the United States.

---

[2]  The Court's opinion today is, as a matter of necessity, based solely on the record presented at this early procedural posture.  Nothing herein should be construed as foreclosing the parties from revisiting certain arguments, when appropriate, upon further development of the record.

[3]  A debenture is a debt secured only by a debtor's earning power, not by a lien on any specific asset. BLACK'S LAW DICTIONARY 460 (9th ed. 2009).  In this context, a debenture is a debt obligation issued by a licensee under 15 U.S.C. § 683(a) and held or guaranteed by the SBA.

1.    <u>SBICs and Capital Impairment</u>

The SBA's Office of SBIC Operations, part of the Small Business Investment Division, is

responsible for monitoring SBICs.  It is the office that determines whether an SBIC is in

compliance with applicable regulations, including, most germane to this action, those relating to

"capital impairment."  Capital impairment is a concept that refers to the degree to which the

private capital of an SBIC has deteriorated because of accumulated losses, both realized and

unrealized, and thus serves as an important indicator of risk in the SBA's leverage position.  *See*

U.S. SMALL BUSINESS ADMINISTRATION, OVERSIGHT & REGULATIONS OF SBIC'S INVESTMENT

DIVISION, STANDARD OPERATING PROCEDURES 10 06 ("SOP 10 06"), ch. 6 para. 10 (2007).

Capital impairment is calculated by adding an SBIC's undistributed net realized loss and

net unrealized depreciation and dividing the result by the SBIC's private capital.  *See* 13 C.F.R. §

107.1840(c).  If an SBIC exceeds the maximum applicable capital impairment percentage, which

is established by regulation, then the SBIC is said to have a condition of capital impairment.[4]  *See*

*id.* § 107.1830(c).  For SBICs like ELK, a capital impairment percentage in excess of 40%

constitutes a condition of capital impairment.  *See id.* § 107.1830(c)(2).

SBICs are obligated to determine whether they have a condition of capital impairment "as

of the end of each fiscal quarter," and must "promptly" notify the SBA if they do, *id.* §

107.1830(e), but the SBA retains the right to make its own determination of an SBIC's capital

impairment "at any time," *id.* § 107.1830(f).  The SBA calculates an SBIC's capital impairment

percentage based on information provided by the SBIC in an audited financial statement known

---

[4]  Conversely, if an SBIC has positive undistributed net realized earnings and net unrealized appreciation, then it is considered to have no capital impairment.  In such a case, the SBA's leverage position is protected.

as a Form 468, which asks an SBIC to provide detailed information about its assets, liabilities, capital, and financial activities.  Each SBIC must file an annual Form 468 on or before the last day of the third month following the end of the fiscal year, and an SBIC with outstanding leverage, such as ELK, must also file an interim Form 468 within thirty days of the close of each fiscal quarter.  *See id.* §§ 107.630(a), 107.1220.

2.   Capital Impairment as an Event of Default

By regulation, a condition of capital impairment is an event of default with opportunity to cure.  *See* 13 C.F.R. § 107.1810(f)(5).  When an SBIC has a condition of capital impairment, the SBA must provide "written notice" to the SBIC, *id.* § 107.1810(g)(1), and afford the SBIC "at least 15 days to cure the default(s)," *id.* § 107.1810(g)(2)(i).  If the SBIC "fail[s] to cure the default(s) to [the] SBA's satisfaction within the allotted time," *id.* § 107.1810(g)(2)(ii), then the SBA may declare the entire indebtedness evidenced by the SBIC's debentures, including accrued interest and any other amounts owed, "immediately due and payable," *id.* § 107.1810(g)(1)(i), institute proceedings for the appointment of the SBA or its designee as the SBIC's receiver, *id.* § 107.1810(g)(1)(ii), or avail itself of any other remedies available by statute, *id.*

As aforementioned, the SBA must afford an SBIC "at least 15 days to cure" a condition of capital impairment before invoking any available remedies.  *Id.* § 107.1810(g)(2)(i).  Beyond that initial fifteen-day period, however, the SBA has declined to establish categorical time limits for curing a condition of capital impairment, adopting instead a case-by-case approach that leaves it to the Office of SBIC Operations to exercise "prudent business judgment" based on the particulars of a given case.  SOP 10 06, ch. 5 para. 8(a).  In making its determination, the Office of SBIC Operations must take into account, among other relevant considerations, (i) whether the

6

SBIC has the "ability . . . to take the requested action," and (ii) "[w]hether corrective action was previously requested." *Id.* As an example of an appropriate time frame, the SBA has provided that a capital impairment resolution plan should generally be submitted within fifteen days. *See id.*

> 3.    Transfer to the Office of SBIC Liquidation

When an SBIC "cannot or does not cure" a condition of capital impairment, it is transferred from the Office of SBIC Operations to the Office of SBIC Liquidation, the part of the Small Business Investment Division that is responsible for the orderly liquidation of SBICs. U.S. SMALL BUSINESS ADMINISTRATION, OFFICE OF SBIC LIQUIDATION, SBIC LIQUIDATION, STANDARD OPERATING PROCEDURES 10 07 1 ("SOP 10 07"), ch. 9 para. 2 (2007); *see also* SOP 10 06, ch. 1 para. 2(b)(4). The primary goal of the Office of SBIC Liquidation is to maximize net recoveries in liquidation, taking into consideration the time value of money, and furthering the integrity of the SBIC program while recognizing the interests of affected parties, such as the small businesses that are funded by SBICs. *See* SOP 10 07, ch. 1 para. 4(a).

An SBIC is said to be "in liquidation" as soon as oversight responsibility is transferred from the Office of SBIC Operations to the Office of SBIC Liquidation. *See* SOP 10 06, ch. 9 para. 1. Several factors may affect the determination of precisely when transfer is appropriate, including, but not limited to, (i) whether the SBIC has net unrealized appreciation that, if counted, would reduce its capital impairment percentage below the maximum allowable threshold, (ii) whether the SBIC has presented satisfactory evidence of a liquidity event due within three quarterly payment dates that would reduce its capital impairment percentage below the maximum allowable threshold, (iii) whether the SBIC is only "marginally impaired," defined

as being within five percentage points of the maximum allowable capital impairment percentage, and (iv) whether the SBIC is in the process of raising new capital.  SOP 10 06, app. 9-1.

"In most cases," an SBIC will be provided advance notice of a "possible transfer" to the Office of SBIC Liquidation.  SOP 10 06, ch. 9 para. 4.  In addition, "[o]nce a licensee has been transferred, the Office of SBIC Liquidation will send a letter notifying the licensee of the transfer."  *Id.*

### 4.  Acceleration of an SBIC's Debentures in Liquidation

When an SBIC is transferred to the Office of SBIC Liquidation, "payment of [the SBIC's] debentures is accelerated."  SOP 10 06, ch. 9 para. 5.  Although consistently conflated by ELK, there are actually two distinct steps in this process.  As a first step, the SBA "will arrange to repurchase the licensee's debentures . . . from the pool[ing] [institution] by notifying the trustee of the acceleration of the debentures."  *Id.*  At that point, the SBA holds the debentures directly and, after providing "written notice" to the SBIC, the SBA may accelerate the SBIC's payment by declaring the SBIC's entire indebtedness, including accrued interest and any other amount owed, "immediately due and payable."  13 C.F.R. § 107.1810(g)(1)(i).  Unless and until the SBA accelerates the SBIC's payment, the SBIC continues to repay any debentures and interest on the same terms and conditions as it previously paid, albeit directly to the SBA.

### 5.  Transfer Back to the Office of SBIC Operations

When an SBIC is transferred to the Office of SBIC Liquidation, liquidation is not inevitable.  Rather, provided "certain conditions are met, the Office of SBIC Liquidation can recommend that a licensee be transferred back to [the Office of SBIC Operations]."  SOP 10 06, ch. 9 para. 6.  The Office of SBIC Operations "may impose [any] conditions deemed necessary at

the time of transfer," but an SBIC must, "[a]t a minimum, . . . demonstrate viability and meet the

licensing standards in effect at the time of the proposed transfer." *Id.*

One of the ways an SBIC may increase its private capital to cure a condition of capital

impairment is through a cash infusion.  Sometimes, transactions by which third parties infuse

cash into an SBIC are structured in such a manner that they result in a change in control of the

SBIC, either through a change in ownership or otherwise.  By regulation, an SBIC must obtain

the SBA's prior written approval of any proposed transaction that results in a change in control

by an individual or entity that has not previously been approved by the SBA.  *See* 13 C.F.R. §

107.410(a).  The SBA may condition approval on (1) an increase in the SBIC's private capital,

(2) the transferee's assumption of personal liability for the SBIC's leverage, and (3) "any other

conditions set by [the] SBA, including compliance with the requirements for minimum capital

and management-ownership diversity as in effect at such time for new license applicants."  *Id.* §

107.440.

On this final point, the so-called management-ownership diversity ("MOD") requirement

has its roots in the SBA's statutory duty to ensure that the management of new

SBICs—specifically, those licensed after September 30, 1996—are "sufficiently diversified from

and unaffiliated" with their ownership, something that is designed to ensure management's

"independence and objectivity in the financial management and oversight of the investments and

operations of the licensee."  15 U.S.C. § 682(c).  But the MOD requirement is not irrelevant for

SBICs, like ELK, that were licensed before the applicable statutory date.  Rather, as

aforementioned, when an SBIC seeks approval for an event that results in a change of control, the

SBA may condition its approval on compliance with the MOD requirement.  *See* 13 C.F.R. §§

107.150(a)(3), 107.440(c).

The MOD requirement can be further divided into three separate sub-requirements, only one of which has much bearing on this case—the percentage ownership requirement. *See* 13 C.F.R. § 107.150(b)-(d). By regulation, no person or group of affiliated persons may directly or indirectly own or control more than 70% of an SBIC's private capital. *Id.* § 107.150(b)(1). However, an exemption from the percentage ownership requirement is made for "traditional investment compan[ies]." *Id.* § 107.150(b)(2). To qualify for the exception, the company "must be a professionally managed firm organized exclusively to pool capital from more than one source for the purpose of investing in businesses that are expected to generate substantial returns to the firm's investors." *Id.* In addition, the SBA will consider: "(i) [w]hether the managers of the firm are unrelated to and unaffiliated with the investors in the firm; (ii) [w]hether the managers of the firm are authorized and motivated to make investments that, in their independent judgment, are likely to produce significant returns to all investors in the firm; (iii) [w]hether the firm benefits from the use of the SBIC only through the financial performance of the SBIC; and (iv) [o]ther related factors." *Id.*

A second way an SBIC may increase its private capital to cure a condition of capital impairment is by obtaining unfunded binding commitments by qualified institutional investors. To qualify, an institutional investor must have a net worth of at least $1 million. *See id.* § 107.50. Moreover, an unfunded binding commitment from an institutional investor cannot be counted towards an SBIC's private capital if (1) the institutional investor has a net worth of less than $10 million and (2) the commitment exceeds 10% of the investor's net worth. *See id.* § 107.230(b)(4). If those conditions apply, then the commitment must be backed by a letter of

credit from a bank acceptable to the SBA.  *See id.*

## B.    Case-Specific Background[5]

ELK, a wholly owned subsidiary of Ameritrans Capital Corporation ("Ameritrans"), was

first licensed as an SBIC in 1980.[6]  Over the years, it has received substantial financial assistance

from the SBA.  Today, ELK has approximately $21,175,000 of outstanding debentures that were

issued between July 2002 and December 2009.  A.R. 14.[7]  This figure reflects, in effect, public

monies that have been extended to ELK to facilitate its ability to function in the marketplace.

### 1.    ELK's Condition of Capital Impairment

On June 21, 2010, ELK submitted its interim Form 468 for the fiscal quarter ending on

March 31, 2010.  A.R. 3.   ELK's submission was more than a month and three weeks late.  ELK

should have submitted its interim Form 468 by no later than April 30, 2010.  *See* 13 C.F.R. §

107.1220.

After reviewing the financial information provided by ELK in its Form 468, the SBA's

---

[5]  The Court avoids the phrase "factual background" because, insofar as ELK seeks relief under the Administrative Procedure Act, "[t]he entire case is a question of law" and the "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action."  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

[6]  As a corporate SBIC organized and licensed for over thirty years, ELK enjoys certain benefits that are not available to new licensees.

[7]  Where appropriate, the Court shall cite to the certified Administrative Record with the abbreviation "A.R." followed by the relevant page number(s).  *See* ECF Nos. [13], [16].  In this case, the SBA made an admirable effort to compile the Administrative Record on an extraordinarily abbreviated schedule, and its designation "is entitled to a strong presumption of regularity."  *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010).  Indeed, the SBA clearly produced a large number of documents to which ELK normally would not even be entitled simply to avoid trivial disputes that would delay the resolution of the pending motion.  Despite having raised a litany of complaints, many of which have been addressed and rejected by the Court during conferences with the parties, ELK has failed to adduce anything remotely approaching the "clear evidence" required to overcome the strong presumption of regularity to which the SBA is entitled.  *Calloway v. Harvey*, 590 F. Supp. 2d 29, 37 (D.D.C. 2008).  Nor has ELK identified a tailored, non-speculative request sufficient to support a request for discovery in any context, let alone in the context of these expedited proceedings.

Office of SBIC Operations determined that ELK had exceeded it maximum allowable capital impairment percentage—that is, 40%—an event of default with opportunity to cure. *See* 13 C.F.R. §§ 107.1810(f)(5), 107.1830(c)(2).  On July 13, 2010, the Office of SBIC Operations informed ELK that the company had a capital impairment percentage of 40.1%, asked ELK to confirm that it agreed with the calculation, and notified ELK that "[a] condition of Capital Impairment will require the scheduling of a portfolio review meeting to discuss the status of [ELK's] portfolio and plan to cure the impairment and the possible issuance of a 15 day cure letter." A.R. 7.  Two days later, on July 15, 2010, the Office of SBIC Operations informed ELK that the SBA would "issue (by the end of the week or early next week) a 15 day cure letter as a result of [ELK's] Condition of Capital Impairment as of 3/31/10." A.R. 12.  On July 16, 2010, ELK responded to the SBA's communications "regarding [ELK's] 40.1% capital impairment as of March 31, 2010." A.R. 13.  ELK represented that it was "actively working on a plan to cure the impairment," stating that its "Auditors and Board of Directors [would meet] next week to formalize a plan and a response." A.R. 13.

On July 20, 2010, the Office of SBIC Operations, sent ELK a letter (the "Cure Letter") notifying the company that its 40.1% capital impairment percentage as of March 31, 2010 exceeded the maximum allowable threshold and "instruct[ing] [ELK] to cure its condition of Capital Impairment, no later than 15 days from the date of th[e] letter [*i.e.*, August 4, 2010], to SBA's satisfaction." A.R. 14.  The Cure Letter expressly warned ELK that "[i]n the event that the condition of Capital Impairment [was] not cured by that date, SBA m[ight] invoke remedies pursuant to § 107.1810(g) to protect its interest." A.R. 14.

By letter dated August 3, 2010, ELK responded to the Cure Letter.[8]  A.R. 54.  In its letter,

ELK conceded that it "was not in compliance with the cited regulations as of March 31, 2010,"

and then continued to stated that ELK "ha[d] carefully reviewed this issue and ha[d] formulated a

plan to bring [ELK] into compliance, on a pro forma basis, by August 4, 2010 as you have

required."  A.R. 54.  Specifically, ELK represented that its corporate parent, Ameritrans, would

"invest $40,000 of new paid-in capital into [ELK] by August 4, 2010 and thereby cure [ELK's]

capital impairment violation."  A.R. 54.  ELK would thereafter "submit a new capital certificate

to SBA demonstrating the basis for [its] compliance with the applicable regulations as well as a

pro forma 468 reflecting the infused capital."  A.R. 54.

On September 1, 2010, an Account Executive in the Office of SBIC Operations, unaware

of ELK's letter dated August 3, 2010, reminded ELK that the Cure Letter required a response

within fifteen days and indicated that the agency had no record of ELK submitting a response,

something that prompted ELK to send another copy of the company's responsive letter dated

August 3, 2010.  A.R. 50, 52.  Two days later, with ELK's response in hand, the Office of SBIC

Operations asked ELK to provide a copy of the capital certificate referenced in the company's

letter dated August 3, 2010.  A.R. 63.  When a copy of the capital certificate was not

forthcoming, the Office of SBIC Operations requested a copy again on September 17, 2010, and

again on September 20, 2010.  A.R. 65, 77, 1762.

On September 22, 2010, ELK told the Office of SBIC Operations that it intended to

---

[8]  The parties dispute when the SBA first received ELK's letter dated August 3, 2010.  Because the dispute is ultimately immaterial, the Court shall afford ELK the more favorable inference and assume that the SBA's office in Washington, D.C., physically received ELK's letter on August 4, 2010, within the fifteen-day cure period. Irrespective of this assumption, everything in the record suggests that the relevant actors in the Office of SBIC Operations were not actually aware of ELK's letter until September 1, 2010.  *See* A.R. 50, 52, 55, 57.

"submit a new capital certificate and revised a [sic] pro forma 468 (for the period ending 3/31/10) by Monday September 27th." A.R. 79. The following day, the Office of SBIC Operations responded, rejecting ELK's suggested approach. A.R. 79. In its response, the Office of SBIC Operations instructed ELK that "the new capital certificate and pro forma 468 would not be as of 3/31/10," that instead "[t]he appropriate date would be the date of the capital infusion which took place subsequent to 3/31/10," and that as a result "there would not be any adjustments to [ELK's] 3/31/10 financials." A.R. 79. In other words, ELK was on notice that its condition of capital impairment would be evaluated on an ongoing basis, or at the very least as of the date of the capital infusion, and not for the fiscal quarter ending on March 31, 2010. Despite these express instructions, by letter dated September 29, 2010, ELK submitted a capital certificate based on ELK's Form 468 for the fiscal quarter ending on March 31, 2010. A.R. 105-16. Subsequently, on October 6, 2010, ELK submitted a letter from its banking institution confirming that $40,000 was deposited into its account on August 4, 2010. A.R. 123-24.

On October 19, 2010, ELK submitted a draft of its annual Form 468 for the fiscal year ending on June 30, 2010, and it submitted a final version on November 22, 2010. A.R. 172-81. Even if ELK's first submission had been in final form, it would have been untimely. ELK should have submitted its annual Form 468 by no later than September 30, 2010. *See* 13 C.F.R. § 107.630(a). In any event, the financial information provided by ELK evidenced that, by the end of the fiscal year on June 30, 2010, ELK's condition of capital impairment had worsened, such that its capital impairment percentage had risen to 43.5%. A.R. 199, 1762. Significantly, as a result of ELK's deteriorating financial condition, the $40,000 capital infusion on August 4, 2010 was insufficient to cure ELK's condition of capital impairment. A.R. 199, 1762. Indeed, in a

14

written submission provided to the SBA on October 12, 2010, ELK acknowledged that its capital impairment percentage exceeded the maximum allowable threshold at the end of the fiscal year on June 30, 2010, as well as at the end of the fiscal quarter on September 30, 2010.  A.R. 139, 156.

        2.     The Proposed CN Transaction

On February 8, 2011, approximately seven months and two weeks after the Cure Letter, ELK sent a letter to the Office of SBIC Operations, acknowledging that it had an "existing condition of capital impairment" and informing the Office of SBIC Operations that its corporate parent, Ameritrans, "ha[d] been actively seeking new capital investment."  A.R. 213.  ELK then proceeded to describe a "possible" transaction through which a third-party investor, an entity managed by Columbus Nova Partners, LLC ("CN"), would channel a minimum of $25 million in cash into ELK through Ameritrans (the "CN Transaction").  A.R. 213.  In addition, ELK informed the Office of SBIC Operations that a subsidiary of the proposed investor had extended Ameritrans a loan in the amount of $1.5 million in order to fund Ameritrans' "working capital needs" and that, in exchange, Ameritrans had pledged all of its stock in ELK as security.  A.R. 214.  ELK further indicated that another agreement could follow, "lead[ing] to another more significant investment in Ameritrans . . . under conditions which [would] result in an indirect change of ownership of Ameritrans and perhaps control of [ELK]."  A.R. 214.

The Office of SBIC Operations responded on March 31, 2011 by notifying ELK that, in the agency's view, the pledge of ELK's stock constituted a change of control requiring the SBA's prior

approval under the applicable regulations.[9]  A.R. 275.  On April 15, 2011, ELK assured the SBA that the closing of the CN Transaction was "specifically predicated on obtaining prior written SBA [a]pproval" and that it would terminate the transaction "[i]f prior written SBA [a]pproval is not obtained."  A.R. 416.

On April 5, 2011, while discussions surrounding the proposed CN Transaction were still ongoing, ELK submitted an updated capital impairment percentage calculation to the Office of SBIC Operations.  A.R. 282.  Consistent with its prior representations, ELK continued to acknowledge that it had an ongoing condition of capital impairment.  A.R. 284.  Indeed, by ELK's calculation, which the Office of SBIC Operations later confirmed, ELK's capital impairment percentage had risen to 46.64% as of December 31, 2010.  A.R. 282, 284.

On May 3, 2011, the Office of SBIC Operations, acknowledging that the terms of the proposed CN Transaction would cure ELK's condition of capital impairment, recommended to the SBA's Investment Committee that ELK be permitted to pursue its proposal further and, to that end, suggested a meeting between ELK and the Investment Committee.  A.R. 437-39.  The Investment Committee adopted the recommendation on May 10, 2011, conditioning the occurrence of a meeting on ELK first submitting information about its management team.  A.R. 498.  Minutes from the session of the Investment Committee evidence that its members were concerned with management's ability to execute the anticipated investment strategy and the qualifications of the proposed new members of the management team, who had apparently been denied a "green light" letter in the past.  A.R. 498.

---

[9]  The Office of SBIC Operations provided ELK with a more formal notice to the same effect on April 19, 2011.  A.R. 426-27.

On May 10, 2011, while these discussions were still ongoing, ELK submitted another updated capital impairment percentage calculation to the Office of SBIC Operations.  A.R. 483. ELK continued to acknowledge its ongoing condition of capital impairment and, consistent with the past trend, ELK's capital impairment percentage had again risen—to 51.31% as of March 31, 2011.  A.R. 494.

The months that followed involved ELK and CN submitting additional information to the SBA for its consideration, as well as a series of communications and meetings between the Office of SBIC Operations, the Investment Committee, ELK, and CN.  On July 12, 2011, approximately three weeks after ELK informed the agency that the new investor in the proposed transaction would be a different entity managed by CN, the Investment Committee met with ELK's representatives.  A.R. 593-94, 710-11.  During this meeting, ELK was informed that the proposed CN Transaction, as modified, would likely be treated as if it were a new license application in light of its effect on the control of ELK and, for that reason, ELK would have to proceed through the SBA's licensing process on an abbreviated schedule.  A.R. 711.  The Investment Committee also raised concerns about the proposed transaction's compliance with the MOD requirement—specifically, the percentage ownership requirement.  A.R. 711.  On July 26, 2011, the Investment Committee again met with representatives of ELK, as well as representatives of CN.  A.R. 777, 800-01.  During this meeting, and in a subsequent memorandum by its legal counsel, ELK expressed its view that, in lieu of treating the proposed transaction as a new license application and conditioning approval on ELK's compliance with the MOD requirement, the SBA should consider "grandfathering" ELK for MOD purposes.  A.R. 800, 1011-16.  In particular, ELK argued that Ameritrans qualified as a "traditional investment

17

company" exempt from the MOD requirement.  A.R. 1014.  During the July 26, 2011 meeting,

the SBA told ELK that it would consider whether "grandfathering" was appropriate, but, at the

same time, ELK was put on notice that if the transaction was not approved, consideration would

have to be given to transferring ELK to the Office of SBIC Liquidation.  A.R. 800.  On August

18, 2011, representatives of ELK and CN met with the Associate Administrator for Investment.

A.R. 989.

 On September 7, 2011, ELK informed the SBA that, "[w]ith respect to compliance with

management and ownership diversity, [ELK] ha[d] negotiated an economic relationship whereby

CN will own less than 70% of the equity of Ameritrans and the balance will be held by existing

public shareholders and other investors to be determined."  A.R. 1191.  On September 19, 2011,

after a series of internal and external communications, the SBA formally notified ELK that, in

the agency's view, "the proposed transaction would not satisfy the requirements of § 107.150

management-ownership diversity requirement" and that ELK "does not qualify for an

exception."[10]  A.R. 1198.  The SBA informed ELK that it would consider the new ownership

structure proposed by ELK in its September 7, 2011 communication, but advised that "[f]or SBA

to proceed with review of the change of ownership and control request, [ELK] must provide a

specific proposed ownership structure identifying each of the new investor(s), the dollar amount

they will invest, and their ownership percentage post-transaction."  A.R. 1198.

---

[10]  The SBA's internal deliberations echoed the concerns it had expressed directly to ELK and CN.  For
example, during an Investment Committee session held on July 14, 2011, Committee members questioned, among
other things, whether the proposed management team had the experience to execute the investment strategy and
whether there was sufficient diversity to satisfy the MOD requirement.  A.R. 718.  Similarly, during a Committee
session held on August 2, 2011, the Committee members were in unanimous agreement that they did not favor
"grandfathering" ELK for purposes of the MOD requirement, suggesting that it would not be appropriate to grant a
waiver, and attendant advantage, that had never before been granted to large investors.  A.R. 811.  And in an August
25, 2011 e-mail, the Associate Administrator for Investment expressed his view that ELK would not be able to
"overcome the MOD issues, and the current structure was not going to work."  A.R. 1039.

Approximately two weeks later, on October 3, 2011, the SBA inquired as to the status of ELK's response to the agency's September 19, 2011 letter.  A.R. 1221.  On October 20, 2011, one year and three months after the SBA issued the Cure Letter, the SBA began internally deliberating about the possibility of transferring ELK to the Office of SBIC Liquidation.  A.R. 1266.  However, on November 15, 2011, ELK submitted a response to the SBA's September 19, 2011 letter.  A.R. 1277.  In its response, ELK described a modified transaction in which CN would hold less than 70% of Ameritrans' stock, the existing management team would remain in place, and the management of both Ameritrans and ELK would report to the Board of Directors of each company.  A.R. 1277-89.  The next day, the SBA informed ELK that it was actively reviewing the company's response, informing ELK that the earliest the modified structure could be presented to the Investment Committee would be in December 2011.  A.R. 1315.  In preparation for that presentation, the SBA requested, and ELK provided, further information regarding the modified transaction.  A.R. 1319, 1333-41.

On December 6, 2011, following oral communications with ELK's representatives, the SBA notified ELK in writing that the proposed transaction, even as modified, still "may not satisfy diversity requirements."  A.R. 1474.  The SBA's December 6, 2011 communication identified three concerns relating to the MOD requirement: (1) whether the new capital infusion would effectively be provided by a single entity on behalf of the new investors; (2) whether stock contributions by new investors, as non-cash assets, would qualify as regulatory capital; and (3) whether the new proposed investors were sufficiently unaffiliated.  A.R. 1474.  During a session held on December 20, 2011, the Investment Committee considered the opinion of the Office of SBIC Operations and the Office of General Counsel that ELK's proposed transaction still did not

satisfy the MOD requirement, and voted to deny ELK's request for a change of ownership and control.  A.R. 1572.  On December 22, 2011, the SBA formally notified ELK of its decision, stating that "the revised proposed structure does not satisfy the requirements of MOD as specified in the [agency's] regulations (§107.150)."  A.R. 1574.  The SBA also identified a number of other concerns, the "cumulative impact" of which "put approval by SBA at risk even if MOD can be satisfactorily resolved."  A.R. 1574-75.  Those concerns included the adequacy of the management team and ELK's prospective investment strategy.  A.R. 1575.

On January 9, 2012, CN withdrew the proposed transaction from the SBA's consideration.[11]  A.R. 1578.  In so doing, CN expressed its appreciation to the SBA for its "extensive consideration of [the] proposed investment."  A.R. 1578.

### 3.     The Proposed BDC Transaction

On February 1, 2012, several weeks after the CN Transaction had been withdrawn and more than one year and six months after the Cure Letter, the Office of SBIC Operations recommended to the Associate Administrator for Investment that ELK be transferred to the Office of SBIC Liquidation.  A.R. 1580.  In its recommendation, the Office of SBIC Operations indicated that (1) ELK had been issued the Cure Letter on July 20, 2010, (2) in the succeeding months ELK's capital impairment percentage "increased to 59% due to additional unrealized losses and operating expenses," (3) ELK's various proposals to cure its condition of capital impairment by raising additional private capital had been denied, and (4) ELK's financial performance was unlikely to cure its condition "in a reasonable time frame."  A.R. 1580.

---

[11]  Although ELK is clearly dissatisfied with the SBA's handling of the CN Transaction, it does not suggest that the transaction could be revived in the future.  Indeed, all of the evidence in the record speaks to the opposite conclusion.

The following day, February 2, 2012, ELK informed the SBA that CN "has indicated that they [sic] are no longer interested in pursuing a transaction," but provided that it was "seeking a new equity investor" and intended to submit yet another proposal for raising private capital for the agency's review.  A.R. 1583.  Attached to ELK's February 2, 2012 communication was an overview of the proposed transaction.  A.R. 1584-1612.  Consistent with the parties' usage, the Court shall refer to the proposed new investor as "BDC" and the proposed transaction as the "BDC Transaction."  Subsequent communications with ELK revealed that the transaction would involve a $10 million cash infusion from BDC, both ELK and Ameritrans would become subsidiaries of BDC, and two of BDC's principals would be added to ELK's management and constitute ELK's Investment Committee.  A.R. 1620.

The SBA advised ELK that the proposed transaction would be treated as a new license application and requested additional information from the company.  A.R. 1620, 1669.  In particular, the SBA advised ELK that it needed to submit a term sheet "as complete as possible," informing ELK that the SBA's Investment Committee would render a decision on the information provided and advising ELK to "put [its] best foot forward."  A.R. 1669.  ELK submitted a term sheet outlining the proposed transaction on February 9, 2012.  A.R. 1674.  On February 13, 2012, the Office of SBIC Operations sent ELK a series of questions about the proposed transaction, to which ELK responded in writing and orally on February 14, 2012.  A.R. 1694, 1712-16.  In its written responses, ELK acknowledged its continued condition of capital impairment.  A.R. 1715.  ELK also outlined its expectations as to the time frame for resolving its proposal.  ELK stated that it hoped to receive "preliminary approval" from the SBA by mid-March 2012 and, assuming that ELK and BDC received "enough comfort," they intended to

21

"move forward with drafting definitive documentation, preparing a proxy statement and arranging for shareholder votes," which ELK anticipated would be completed by mid-June 2012. A.R. 1715.

On February 15, 2012, the Office of SBIC Operations recommended to the Investment Committee that it deny ELK a "move forward" ruling and instead transfer ELK to the Office of SBIC Liquidation. A.R. 1720. As grounds, the Office of SBIC Operations first found that ELK's term sheet was "not definite enough to reasonably predict the path that will lead to consummation of the acquisition to SBA's satisfaction."[12] A.R. 1720. It next found that "[a]lthough the $10 million capital infusion [would] initially cure [ELK's] condition of Capital Impairment," it would "not leave much room for error" because ELK's "financial performance ha[d] deteriorated over time." A.R. 1720. It concluded by noting that ELK "had at least $1 million of net losses in each of the last three fiscal years" and had "$5 million of leverage due to SBA within the next 12 month[s]," limiting the "cash available for investment activities." A.R. 1720. During a session held on February 16, 2012, the members of the Investment Committee unanimously agreed to give no further consideration to the proposal. A.R. 1737. Minutes from the session suggest that the Investment Committee was concerned that a new license application could not be approved in the time frame required and that the cash infusion provided by the transaction would not provide a meaningful benefit. A.R. 1736-37.

On February 27, 2012, the SBA formally notified ELK of its decision. A.R 1754. The SBA provided that, "[a]fter significant discussion, the Investment Division ha[d] concluded that

---

[12] Elk concedes that it assembled the BDC Transaction "quickly," but intimates that the SBA should have granted pre-approval of the transaction because the process of structuring the deal would be time-consuming and costly. Suffice it to say that ELK identifies no authority for the proposition that the SBA is required to provide advance approval of a preliminary transaction.

the proposal does not address [ELK's] financial condition to the SBA's satisfaction," citing a

concern that the $10 million capital infusion would not "have a lasting positive effect" given

ELK's "deterioration and maturing Debenture leverage within the next 12 months," as well as

issues with the current management team.  A.R. 1754.

4.      ELK's Transfer to the Office of SBIC Liquidation

On February 21, 2012, shortly after the Investment Committee voted to discontinue

consideration of the BDC Transaction, the Office of SBIC Operations informed ELK that

"[g]iven that [ELK] has not been able to cure its condition of capital impairment, the Office of

SBIC Operations will be recommending that [ELK] be transferred to the Office of Liquidation."

A.R. 1741.  The decision to transfer ELK to the Office of SBIC Liquidation was finalized on

February 22, 2012, more than one year and seven months after the Cure Letter.  A.R. 1742-43.

The stated reason for the transfer decision was as follows:

> The Licensee initially developed a condition of Capital Impairment
> as of 3/31/10 with a Capital Impairment Percentage ("CIP") of
> 40.1%.  Its maximum permissible CIP is 40%.  SBA sent out a 15 day
> Cure Letter on 7/20/10.  SBA has since considered several proposals
> put forth by the Licensee to cure its condition of Capital Impairment.
> After significant discussion and consultation [sic] with the Office of
> General Counsel, SBA concluded that the proposals did not satisfy
> regulatory requirements.  As of 9/30/11, the Licensee's CIP increased
> to 59%.

A.R. 1742.  ELK was notified of the transfer decision on February 23, 2012.  A.R. 1744.

On February 24, 2012, ELK responded by asking the SBA to "confirm . . . that the SBA

will be providing [ELK] with formal notice under 13 CFR 1810(g)(2) of [ELK's] capital

impairment and a 15 day opportunity to cure this event of default."  A.R. 1746.  Subsequently, by

e-mail dated February 29, 2012, ELK expressed its view that its letter dated August 3, 2012

resolved the Cure Letter because it "stat[ed] that . . . the letter and its attachment were fully responsive to the SBA's July 20, 2010 letter and [ELK] heard no objections from the SBA." A.R. 1771.  ELK further asserted that "[a]t no time did the SBA advise that [ELK] was not in compliance or that [its] response to the July 20, 2010, letter had not satisfied the SBA's concerns on the capital impairment issue."  A.R. 1771.  In addition, ELK claimed that, during a portfolio meeting held on October 19, 2010, "all present acknowledged that the capital impairment issue had been resolved."  A.R. 1771.  ELK concluded by stating that unless the SBA issued a new fifteen-day cure notice, ELK would commence litigation.  A.R. 1771.  Later that same day, the Office of SBIC Operations asked the Office of SBIC Liquidation to stay the liquidation process. A.R. 1801.

### 5.   The Second Cure Letter

On March 6, 2012, the SBA sent ELK another cure letter (the "Second Cure Letter"), stating that ELK "has a condition of Capital Impairment based on its last SBA Form 468 dated September 30, 2011, which revealed a Capital Impairment Percentage . . . of 59%."  A.R. 1818. The SBA "direct[ed] [ELK] to cure the violation to SBA's satisfaction within fifteen (15) days from the date of th[e] letter"—that is, by March 21, 2012—and warned that, absent timely cure, "SBA may avail itself of any and all legal remedies available to it under Section 107.1810(g) of the Regulations, which include declaring [ELK's] total indebtedness to SBA immediately due and payable and/or the institution of legal proceedings seeking the appointment of SBA as [ELK's] receiver."  A.R. 1818.  At the same time, the SBA maintained that it "never determined that the $40,000 increase in Regulatory Capital [on August 4, 2010] constituted a satisfactory cure of [ELK's] condition of Capital Impairment."  A.R. 1819.  It reiterated that, "by the time

that SBA was made aware of [ELK's] intent to cure its condition of Capital Impairment by the $40,000 increase to Regulatory Capital, [ELK's] CIP had increased to 43.5%." A.R. 1819. The SBA stated its position that ELK was informed during the October 19, 2010 portfolio meeting that "the $40,000 capital contribution was not considered a satisfactory plan to cure its condition of Capital Impairment." A.R. 1819. The SBA concluded the Second Cure Letter by advising ELK that, "[n]otwithstanding the transfer to the Office of Liquidation, SBA will suspend liquidation activities for a period of 15 days from the date of this letter to allow [ELK] an opportunity to cure its condition of Capital Impairment to SBA's satisfaction." A.R. 1819.

On March 8, 2012, ELK acknowledged receipt of the Second Cure Letter. A.R. 1821. After stating its disagreement with the SBA's position in general and non-specific terms, ELK indicated that the company would "concentrate on ELK's efforts to cure the default" and that, "[t]o that end, Ameritrans continue[d] to actively engage with various potential investors." A.R. 1821. ELK represented that it intended to deliver "binding commitment letters prior to the expiration of the cure period"—that is, by March 21, 2012. A.R. 1821.

On March 13, 2012, the SBA responded to ELK's stated intention to deliver "binding commitment letters" as a cure for its condition of capital impairment. A.R. 1832. The SBA advised ELK that, "[a]t this time, [the] SBA cannot determine whether [the company's] proposed cure [would] satisfactorily resolve [its] condition of Capital Impairment." A.R. 1833. In particular, the SBA advised ELK that it would apply the guidance articulated in the SBA's TECHNOTE 13: GUIDELINES CONCERNING DEBENTURE APPLICANTS STRUCTURED AS A BUSINESS DEVELOPMENT COMPANY OR BDC SUBSIDIARY ("TechNote 13") "to determine whether binding commitments to [Ameritrans] will qualify as Regulatory Capital." A.R. 1833. In this regard, the

SBA noted that Ameritrans' net worth was negative as of December 31, 2011, and on that basis stated that "it is likely that any [] commitments from [Ameritrans] to [ELK] will need to be funded to qualify as Regulatory Capital." A.R. 1833.  However, the SBA clearly stated that it could not, at that time, render a final decision, and instructed ELK to submit additional information, including "the fully executed binding commitment letters" and an "updated capital certificate." A.R. 1833.

ELK responded the following day, March 14, 2012, contending that the SBA's had imposed "new and unreasonable conditions" in its latest correspondence. A.R. 1838, 1841.  In its response, ELK took the position that TechNote 13 was inapplicable because it applies only to new applicants. A.R. 1839.  Furthermore, ELK stated that it still intended to "provide binding commitment letters from qualified investors in an amount sufficient to cure [ELK's]" condition of capital impairment, and further advised that "[t]he commitment letters will state that the entire amount of the investment will be invested into Ameritrans and then be immediately invested by Ameritrans into [ELK]." A.R. 1840.  However, ELK offered the proviso that, "given that Ameritrans is a public company, the commitment letter[s] will provide that the commitments will be invested into Ameritrans immediately upon receipt of any shareholder approval that may be required prior to the investment," though it claimed that "Ameritrans has the ability to lock-up approximately 45% of the voting shares, effectively insuring shareholder approval." A.R. 1840.  ELK concluded by unilaterally asserting that the SBA's "March 13, 2012 letter effectively served as a modification of the March 6th letter and 'reset' the 15 day notice," and asserted that it would "consider March 29, 2012, as the date required to cure the Capital Impairment." A.R. 1844.

On March 19, 2012, the SBA responded in turn, stating that "[t]he purpose of the SBA's

March 13, 2012 letter was to provide feedback on [ELK's] proposed cure method so that [the company] did not pursue a cure that, in the end, would not be to SBA's satisfaction." A.R. 1846. The SBA took the position that it was not "imposing new requirements" on ELK, claiming that TechNote 13 "codified SBA's policy in determining whether a parent business development company," like Ameritrans, "qualified as an Institutional Investor." A.R. 1846. The SBA noted that, because Ameritrans' "net worth is negative as of December 31, 2011, it is likely that any commitments from [Ameritrans] to [ELK] will need to be funded to qualify as Regulatory Capital." A.R. 1846. The SBA also observed that because ELK appeared to plan on conditioning the anticipated commitment letters on shareholder approval, they would "appear to be subject to a condition precedent making the commitment letters non-binding and thus not eligible to be counted towards Regulatory Capital." A.R. 1846. Finally, the SBA rejected ELK's unilateral interpretation of the agency's March 13, 2012 letter, reaffirming that the cure period would expire on March 21, 2012. A.R. 1847.

It is undisputed that ELK continues to have a condition of capital impairment. It is similarly undisputed that, to date, ELK has not submitted any binding commitment letters to the SBA for its consideration.

###   C.   Procedural History

ELK commenced this action on March 20, 2012, seeking relief under the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment to the United States Constitution for what it claims is the SBA's arbitrary and capricious conduct. *See* Compl., ECF No. [1]. ELK filed its Motion for Preliminary Relief the same day. *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. & TRO ("Pl.'s Mem."), ECF No. [3-2]. Upon receipt of ELK's motion, the

Court immediately contacted the parties in order to schedule further proceedings.  At that point,

the parties jointly represented that they had reached an agreement to suspend any liquidation

activities involving ELK through and including April 5, 2012.  *See* Min. Order (Mar. 20, 2012).

The Court held an expedited in-person Scheduling Conference on March 21, 2012.  ELK's

Complaint is prolix and disjointed, rattling off a litany of complaints about how the SBA has

treated the company over the parties' long relationship.  Because this approach rendered it

impossible to ascertain which of the SBA's actions were actually at issue, a fair amount of the

Court's attention during the Scheduling Conference was directed towards attempting to get ELK

to specifically identify the precise administrative action it intended to challenge in connection

with its Motion for Preliminary Relief.  *See* Tr. of Initial Scheduling Conf. at 13-19.  In addition,

during the Scheduling Conference, the parties represented that they had reached a further

agreement to suspend any liquidation activities through and including April 25, 2012, preserving

the status quo until then.  *See id.* at 4-5, 28-29.  On March 21, 2012, the Court set an expedited

schedule for the briefing of ELK's Motion for Preliminary Relief and denied without prejudice

ELK's Motion for Preliminary Relief insofar as it constituted a motion for a temporary

restraining order, since ELK had already obtained the relief sought thereby through the SBA's

voluntary agreement.  *See* Scheduling & Procedures Order (Mar. 21, 2012), ECF No. [7]; Order

(Mar. 21, 2012), ECF No. [6].  Accordingly, ELK's Motion for Preliminary Relief remains

extant only insofar as it constitutes a motion for a preliminary injunction.

Outside the scope of the Court's schedule, and without prior leave of the Court, ELK

filed a supplement to its Motion for Preliminary Relief on March 26, 2012.  *See* Supplemental

Aff. of Michael Feinsod, ECF No. [10].[13]  On March 29, 2012, in accordance with the Court's

schedule, the SBA filed the certified Administrative Record.  *See* ECF No. [13].  On April 2,

2012, the Court held an expedited on-the-record telephonic conference to discuss the parties'

dispute over the scope of the record and the SBA's privilege log.  During that conference, ELK

clarified that, in connection with its Motion for Preliminary Relief, it is presently challenging

only (1) the SBA's decision to transfer ELK to the Office of SBIC Liquidation on February 22,

2012, and (2) the SBA's Second Cure Letter dated March 6, 2012 and the conditions purportedly

placed on the Second Cure Letter in the SBA's letter dated March 13, 2012.[14]  *See* Tr. of Apr. 2,

2012 Telephone Conf. at 33-34, 50-51; *see also* Min. Order (Apr. 2, 2012) (memorializing the

same).  On April 5, 2012, consistent with the Court's instructions during the April 2, 2012

conference, the SBA filed a small supplement to the Administrative Record.  *See* ECF No. [16].

On April 9, 2012, the SBA filed its Opposition to ELK's Motion for Preliminary Relief.  *See*

Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.'s Opp'n"), ECF No. [18].  On April 11, 2011,

---

[13]  Under the Local Rules of this Court, "[s]upplemental affidavits either to the application or opposition may be filed only with permission of the court."  LCvR 65.1(c).

[14]  The April 2, 2012 conference included the following exchange between the Court and ELK's counsel:

> THE COURT:  * * *  If we can clarify, I take it — and I did not go back and look, but I take it then you're challenging on both the APA and due process, you're challenging the transfer to the Liquidation Unit as well as what you view as conditions in the letter to cure.  Is that an accurate statement, so we know what's at issue?

> MR. HEYMAN: So it's absolutely clear  * * *  We're challenging the conditions that were placed on the March 6th letter by the March 13th e-mail or letter, which incorporated TechNote 13, and we're also challenging the transfer to Liquidation for purposes of the preliminary injunction.

> THE COURT:  So, it's the March 6th and the March 13th letters, in essence.

> MR. HEYMAN: And the transfer to Liquidation.

Tr. of Apr. 2, 2012 Telephone Conf. at 50-51.

the Court held an expedited on-the-record telephonic conference to resolve the parties' dispute

regarding certain items on the SBA's privilege log.  On April 12, 2012, ELK filed its Reply.  *See*

Pl.'s Reply Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Reply"), ECF No. [22].  On April 16,

2012, after carefully considering the parties' submissions, the Court advised the parties that it

would exercise its discretion to decide the motion on the papers and without hearing live

testimony or oral argument.  *See* Min. Order (Apr. 16, 2012) (citing LCvR 7(f); LCvR 65.1(d)).

ELK's Motion for Preliminary Relief is therefore fully briefed and ripe for adjudication.

## III.  PRELIMINARY MATTERS

As a threshold matter, SBA contends that this Court is precluded from granting ELK

injunctive relief by virtue of 15 U.S.C. § 634(b)(1) ("Section 634(b)(1)"), which provides:

> In the performance of, and with respect to, the functions, powers, and
> duties vested in [her] by this chapter the Administrator [of the SBA]
> may . . . sue and be sued . . . in any United States district court, and
> jurisdiction is conferred upon such district court to determine such
> controversies without regard to the amount in controversy; but no
> attachment, injunction, garnishment, or other similar process, mesne
> or final, shall be issued against the Administrator or [her] property[.]

15 U.S.C. § 634(b)(1).  Some courts have read the anti-injunction language in Section 634(b)(1)

literally and concluded that injunctive relief against the SBA[15] is absolutely foreclosed.  *See, e.g.*,

*J.C. Driskell, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990); *Valley Constr. Co. v. Marsh*,

714 F.2d 26, 29 (5th Cir. 1983); *Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975).  Such a

sweeping interpretation of Section 634(b)(1) has not taken hold in this Circuit, where courts have

strongly intimated that injunctive relief is available, at a minimum, when the SBA exceeds its

statutory authority.  *See Valley Forge Flag Co., Inc. v. Kleppe*, 506 F.2d 243, 245 (D.C. Cir.

---

[15]  Neither party contends that there is a material difference between the SBA and the Administrator for purposes of the Court's analysis under Section 634(b)(1).

1974) (per curiam); *U.S. Women's Chamber of Commerce v. U.S. Small Bus. Admin.*, 2005 WL 3244182, at *14 (D.D.C. Nov. 30, 2005); *San Antonio Gen. Maint., Inc. v. Abdnor*, 691 F. Supp. 1462, 1467 (D.D.C. 1987).

The question that remains is whether injunctive relief is available in a broader set of cases. The SBA contends, in essence, that so long as it has not clearly acted outside its statutory authority, no injunction may issue from this Court even if the SBA's actions are arbitrary, capricious, or an abuse of discretion. In other words, SBA claims that injunctive relief is unavailable provided there is a colorable basis for concluding that the agency acted within its enumerated powers. *Cf. OneSimpleLoan v. U.S. Sec'y of Educ.*, 2006 WL 1596768, at *5 (S.D.N.Y. June 9, 2006), *aff'd*, 496 F.3d 197 (2d Cir. 2007), *cert. denied*, 552 U.S. 1180 (2008). Is the availability of injunctive relief, as the SBA suggests, confined to those instances in which the SBA clearly exceeds its statutory authority? Or does it, as ELK suggests, also extend to those cases in which the SBA acts in a manner that is arbitrary, capricious, or an abuse of discretion under the Administrative Procedure Act?[16]

Unfortunately, the legislative history and case law relating to Section 634(b)(1) provide little guidance in answering these questions. The legislative history of Section 634(b)(1) itself is silent on the precise purpose behind the anti-injunction language chosen by Congress. *See Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1056-57 (1st Cir. 1987); *Related Indus., Inc. v. United States*, 2 Ct. Cl. 517, 522 (Ct. Cl. 1983). However, the same anti-injunction language is frequently found in statutes defining the powers of agencies that provide loans or funds to the

---

[16]  The question of whether injunctive relief is available rises and falls on Section 634(b)(1) because the Administrative Procedure Act does not authorize injunctive relief "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702; *see also Schnapper v. Foley*, 662 F.2d 102, 108 (D.C. Cir. 1981), *cert. denied*, 455 U.S. 948 (1982).

public. *See, e.g.*, 7 U.S.C. § 1506(d); 15 U.S.C. § 714b(c); 42 U.S.C. § 3211(13).  The

legislative history of those statutes suggests that Congress intended the anti-injunction language

"to keep creditors and others suing the government from hindering and obstructing agency

operations through mechanisms such as attachments of funds."  *Ulstein*, 833 F.2d at 1056-57.

Meanwhile, there is no authority from this Circuit standing for the proposition that an injunction

may issue consistent with Section 634(b)(1) when the agency has acted within the scope of its

statutory authority, but has exercised its authority in a manner that is arbitrary, capricious, or an

abuse of discretion.  *But see Oklahoma Aerotronics, Inc. v. United States*, 661 F.2d 976, 977

(D.C. Cir. 1981) (per curiam) (rejecting the SBA's unidentified "arguments about sovereign

immunity and injunctive relief [as] irrelevant" and providing that a "court may hold unlawful and

set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law'") (quoting 5 U.S.C. § 706(2)(A)).  But neither is there any authority

standing for the opposite proposition.  In short, neither the legislative history nor case law

provides a ready answer to the question of how Section 634(b)(1) applies in this case.

In interpreting Section 634(b)(1), this Court must be guided by the United States Supreme

Court's instruction that "such sue-and-be-sued waivers are to be liberally construed,

notwithstanding the general rule that waivers of sovereign immunity are to be read narrowly in

favor the sovereign."  *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 480 (1994) (internal

quotations marks and citation omitted); *see also Fed. Housing Admin., Region No. 4 v. Burr*, 309

U.S. 242, 245 (1940).  For this reason, the idea of construing Section 634(b)(1) to grant the SBA

any greater immunity from injunctive relief under the Administrative Procedure Act than is

enjoyed by other federal agencies gives this Court pause.  *Cf. Cavalier Clothes, Inc. v. United*

*States*, 810 F.2d 1108, 1112 (Fed. Cir. 1987) ("[N]othing either in the language or legislative history of § 634 suggests that Congress intended to grant the SBA any greater immunity from injunctive relief than that possessed by other governmental agencies.").  At the same time, the Court harbors some concern that the specific injunctive relief sought by ELK in this case could implicate the sort of interference with "the agency's assets" that other courts have suggested falls within the ambit of Section 634(b)(1)'s anti-injunction language.[17]  *Ulstein*, 833 F.2d at 1056.

Ultimately, the Court need not resolve these difficult questions about the scope of Section 634(b)(1) and its application to this case.  For the reasons set forth below, even assuming the availability of injunctive relief as a hypothetical matter, the Court concludes that ELK has failed to satisfy the traditional four-part test for a preliminary injunction.

## IV.  LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).  A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) an injunction would be in the public interest.  *Id.* at 20.  Historically, these four factors have been evaluated on a "sliding scale" in this Circuit, such that a stronger showing on one factor could make up for a weaker showing on another.  *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360-61 (D.C. Cir. 1991).  Recently, the continued viability of that approach has been called into some doubt, as the

---

[17]  For instance, the relief requested by ELK might prevent the SBA from protecting against future losses by accelerating ELK's payment on the debentures the agency now holds.  *See* 13 C.F.R. § 107.1810(g)(1)(i).

United States Court of Appeals for the District of Columbia Circuit has suggested, without

holding, that a likelihood of success on the merits is an independent, free-standing requirement

for a preliminary injunction.  *See Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011);

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).  However, absent

binding authority or clear guidance from the Court of Appeals, the Court considers the most

prudent course to bypass this unresolved issue and proceed to explain why a preliminary

injunction is not appropriate under the "sliding scale" framework.  If a plaintiff cannot meet the

less demanding "sliding scale" standard, then it cannot satisfy the more stringent standard alluded

to by the Court of Appeals.

## V.  DISCUSSION

Through its Motion for Preliminary Relief, ELK seeks a preliminary injunction:

(1)     Requiring the SBA to issue ELK a right to cure letter presenting ELK with a

"commercially reasonable" period to present commitment letters reflecting funds

to bring its capital impairment percentage to 40% or lower;

(2)     Suspending any liquidation activities by the Office of SBIC Liquidation during the

pendency of this action;

(3)     Enjoining the SBA from taking any action that would affect ELK's status as an

SBIC licensee; and

(4)     Commanding the SBA to issue a public statement, or allowing ELK to represent

to investors, that the SBA will not accelerate ELK's obligations on its

debentures.[18]

Considering the record as a whole, the Court finds that ELK has failed to make a "clear

showing" that it is entitled to the "extraordinary relief" of a preliminary injunction. *Winter*, 555

U.S. at 21.  Accordingly, ELK's Motion for Preliminary Relief shall be DENIED.

### A.    Likelihood of Success on the Merits

ELK, as the party seeking a preliminary injunction, bears the burden of establishing that it

is likely to succeed on the merits.  *See Winter*, 551 U.S. at 20.  ELK claims that a preliminary

injunction should issue in this case because the SBA's alleged conduct ran afoul of the

Administrative Procedure Act and the Due Process Clause of the Fifth Amendment.[19]

Specifically, ELK challenges: (1) the SBA's decision to transfer ELK to the Office of SBIC

Liquidation on February 22, 2012; and (2) the SBA's Second Cure Letter dated March 6, 2012

and the conditions purportedly placed on the Second Cure Letter in the SBA's letter dated March

13, 2012.[20]  Upon a searching review of the record, the Court concludes that ELK has not carried

---

[18]   ELK first identified this final element of its requested relief in its Reply.  *See* Pl.'s Reply at 2 n.1.
Because ELK's chosen approach deprived the SBA of the opportunity to offer a meaningful response, the Court is
strongly disinclined to consider the request at all.  But because ELK's Motion for Preliminary Relief fails for other
reasons, the Court need not decide whether consideration of ELK's belated request is appropriate.

[19]   Neither party's analysis offers any meaningful distinction between ELK's claims under the
Administrative Procedure Act and ELK's claims under the Due Process Clause, except that the parties dispute
whether ELK can show that it has a cognizable interest under the Due Process Clause.  For present purposes, the
Court shall assume, without deciding, that ELK can make such a showing, obviating the need to divide the Court's
discussion between the two sets of claims at this time.

[20]   As described in greater detail above, *see supra* Part II.C, although ELK's Complaint rattles off a litany of
complaints about how the SBA has treated the company over the parties' long relationship, ELK has self-limited the
arguments it is pursuing in connection with its Motion for Preliminary Relief.  Because the Court and the SBA have
relied on ELK's representations in the course of structuring these expedited proceedings, the Court shall hold ELK to
its representations.  In this regard, the Court observes that ELK's submissions frequently devolve into an irrelevant
discussion of decisions that are not directly at issue in connection with ELK's Motion for Preliminary Relief.  Most
notably, ELK repeatedly characterizes the SBA's handling of the proposed CN Transaction and the proposed BDC
Transaction as arbitrary and capricious.  The Court rejects this approach.  ELK cannot make the "clear showing"
required to support the "extraordinary remedy" of a preliminary injunction by presenting the SBA, and this Court,
with a moving target.  *Winter*, 551 U.S. at 21.  In any event, considering the record as a whole, the Court is wholly

its burden of establishing that it is likely to succeed on the merits in either regard.

Before proceeding to the heart of the matter, however, the Court pauses to observe that whenever ELK is dissatisfied with a decision made by the SBA, its repeated refrain is that the agency acted in bad faith. Suffice it to say that ELK's conclusory and speculative assertions, unsupported by any competent evidence, are patently insufficient to overcome the presumption of administrative regularity. *See United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absent of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Moreover, the record belies ELK's speculation. The SBA afforded ELK countless opportunities to come into compliance and afforded ELK's many shifting proposals due consideration. It is wholly unsurprising that the SBA, holding over $21 million in outstanding debentures from a company whose financial condition had been steadily deteriorating over a period of more than a year and seven months, would consider protecting its leverage position through the very mechanism contemplated by the statutory and regulatory scheme—namely, liquidation. At the end of the day, the SBA's ultimate responsibilities in this context are to maximize net recoveries of public funds and to further the integrity of the SBIC program while recognizing the interests of affected parties. Everything in the record evidences that the SBA gave ELK's unfortunate financial condition its due when balancing these interests.

---

unpersuaded by ELK's collateral attacks on the SBA's decisionmaking. At this procedural posture, the record amply supports the conclusion that the SBA did not act arbitrarily or capriciously, abuse its discretion, or deprive ELK of due process in connection with its consideration of the CN Transaction, the BDC Transaction, or in any other respect. *See supra* Parts II.B.2, II.B.3.

1.      Transfer to the Office of SBIC Liquidation

The SBA transferred ELK from the Office of SBIC Operations to the Office of SBIC

Liquidation on February 22, 2012, a step that officially put the company "in liquidation."  SOP

10 06, ch. 9 para. 1.  Whether a transfer to the Office of SBIC Operations is appropriate has two

components—the first procedural and the second substantive.  In this case, ELK's arguments

focus almost exclusively on the procedural side of the inquiry, and so the Court begins there.

i.      Procedural Compliance

Before transferring an SBIC to the Office of SBIC Liquidation, the SBA must provide the

SBIC with "written notice" of its condition of capital impairment and afford the SBIC "at least

15 days to cure the default(s)."  13 C.F.R. § 107.1810(g).  Despite ELK's consistent efforts to

draw the attention elsewhere, this much is clear: the Office of SBIC Operations sent ELK the

Cure Letter on July 20, 2010, in which the agency (1) notified ELK that its 40.1% capital

impairment percentage exceeded the maximum allowable threshold, (2) instructed ELK that it

had a fifteen-day period to cure, and (3) expressly warned ELK that, absent a timely cure, the

agency would consider invoking its statutory and regulatory remedies, which include liquidation.

A.R. 14.  It is equally beyond cavil that, following the issuance of the Cure Letter, ELK was

afforded "at least 15 days to cure."  Indeed, ELK had more than one year and seven months to

cure before it was transferred to the Office of SBIC Liquidation.[21]

---

[21] ELK relies on a section of the Administrative Procedure Act that provides that "the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given—(1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements."  5 U.S.C. § 558(c).  As a threshold matter, ELK misapplies the provision to this case.  The SBA has not actually withdrawn, suspended, revoked, or annulled ELK's SBIC license.  ELK can at least hypothetically exit the Office of SBIC Liquidation with its license intact.  *See* SOP 10 06, ch. 9 para. 6.  However, even assuming, for the sake of argument, that the provision applies here, ELK in fact received notice and an opportunity to be heard—and was heard—prior to being referred to the Office of SBIC Liquidation.  *See Empresa Cubana Exportadora de Alimentos y Productos*

Nonetheless, ELK maintains that the SBA's transfer decision was procedurally defective because the Cure Letter was no longer in effect at the time of the transfer, a contention that rises and falls on ELK's belief that it cured its condition of capital impairment on August 4, 2010, when it received a $40,000 cash infusion from Ameritrans. However, the Court simply cannot agree that ELK is likely to show that it actually cured its condition of capital impairment through the cash infusion. By June 30, 2010, ELK's capital impairment percentage had risen to 43.5%, meaning that the modest cash infusion on August 4, 2010 was insufficient to cure ELK's condition of capital impairment.[22]  A.R. 199, 1762.  Indeed, ELK acknowledged that its capital impairment percentage exceeded the maximum allowable threshold as of both June 30, 2010 and September 30, 2010.  A.R. 139, 156.

No doubt seeing the writing on the wall, ELK counters that the cash infusion constituted an adequate cure because the SBA never told it otherwise.  *See* Aff. of Michael Feinsod ("Feinsod Decl."),[23] ECF No. [3-3], ¶ 7.  Even while making this claim, ELK acknowledges that the "obverse is equally true," Pl.'s Reply at 7—that is, that the SBA *never* informed ELK that the cash infusion *did* constitute a satisfactory cure.  But even absent this acknowledgment, the Court rejects ELK's theory of acquiescence by silence.  Whereas the applicable regulations may require

---

*Varios v. U.S. Dep't of Treasury*, 638 F.3d 794, 801-02 (D.C. Cir. 2011).

[22]  ELK was on notice that its condition of capital impairment would be evaluated on an ongoing basis, or at the very least at the time of the capital infusion, and not as of the end of the fiscal quarter ending on March 31, 2010. A.R. 79.  When ELK submitted a capital certificate based on its Form 468 for the fiscal quarter ending on March 31, 2010 as evidence of its purported cure, it did so despite the SBA's express prior instructions to the contrary.  A.R. 79, 123-34.  To the extent ELK intends to suggest that the effect of its attempted cure must be applied retroactively to the end of the fiscal quarter on March 31, 2010, it has offered no authority—none—for such an approach.  On this record, the Court cannot conclude that the SBA acted arbitrarily or capriciously when it asked whether the cash infusion on August 4, 2010 was sufficient at the time it was received.  *Cf.* 13 C.F.R. § 107.1830(f) ("SBA may make its own determination of [an SBIC's] Capital Impairment condition at any time.").

[23]  Although styled as an "affidavit," the submission is in fact a declaration.

the SBA to provide SBICs with written notice of a condition of capital impairment, and whereas the SBA's standard operating procedures may identify a preference for affording SBICs advance notice of a transfer to the Office of SBIC Liquidation, there is nothing to suggest that the SBA is somehow obligated to provide an SBIC with notice as to the suitability of an attempted cure, let alone in a particular form or at a particular time.

ELK's arguments, however, do not stop there.  Even while acknowledging that the SBA never actually notified it that the cash infusion was an adequate cure, ELK relies upon a series of vague and unilluminating statements, plucked entirely out of context, in an attempt to insinuate that the SBA believed or told ELK that the company had cured its condition of capital impairment.  At this procedural posture, the Court finds ELK's arguments, which are three-fold, wholly unpersuasive.

First, ELK proffers the statement from its declarant that, during a meeting between the SBA and ELK's representatives on October 19, 2010, "[i]t was acknowledged . . . that the Capital Impairment issue raised by the SBA had been resolved."  Feinsod Decl. ¶ 9.  Such a vague and ambiguous statement is hardly probative of anything, especially when it contradicts everything in the record and stands in considerable tension with ELK's own representations to this Court.  In its Opposition, the SBA rightly faults ELK for failing to "state who made that acknowledgment or in what manner it was made."  Def.'s Opp'n at 29.  ELK purports to remedy this patent defect in its Reply by submitting a supplemental declaration from its declarant, *see* Second Supplemental Aff. of Michael Feinsod ("Second Suppl. Feinsod Decl."),[24] ECF No. [22-3], but ELK never sought this Court's leave to file its supplemental declaration and therefore it

---

[24]  Again, although styled as an "affidavit," the submission is in fact a declaration.

shall not be considered.  *See* LCvR 65.1(c) ("Supplemental affidavits either to the application or

opposition may be filed only with permission of the court.").  Moreover, even if the Court were

inclined to consider the declaration, ELK claims that it "explain[s] that the statement was made

by [the relevant Area Chief for the Office of SBIC Operations], and that the parties also

discussed the need for ELK to raise regulatory capital," Pl.'s Reply at 8 (Second Suppl. Feinsod

Decl.") ¶ 4), but the cited paragraph has nothing to do with the October 19, 2010 meeting, *see*

Second Suppl. Feinsod Decl. ¶ 4.  ELK has failed to furnish a "precise" citation to the portion of

the record upon which it relies, Scheduling & Procedures Order ¶ 4(c), and the Court declines to

sift through the record to ascertain whether there is other evidence supporting or contradicting

ELK's contention.  Despite these infirmities, the Court pauses to observe that, in his

supplemental declaration, ELK's declarant merely denies that he was told that the capital

infusion did *not* constitute an adequate cure.  *See* Second Suppl. Feinsod Decl. ¶ 5.  He does not

affirmatively state that anyone from the SBA said the obverse—that is, that the capital infusion

*did* constitute an adequate cure, let alone under circumstances that would allow this Court to

conclude that any such statement could be construed as tantamount to a formal agency

determination.

Second, ELK relies upon an e-mail circulated internally within the SBA that informally

outlines a chronology of events relevant to ELK, claiming that the document shows that the SBA

believed that ELK had cured its condition of capital impairment.  A.R. 1762.  However, even

ELK characterizes the document as "after-the-fact" and argues that it should be disregarded

altogether on that basis.  Pl.'s Reply at 7.  Regardless, the statement cannot bear the weight put

on it by ELK.  At best, the cursory statement, made without any explanation, suggests that a

40

member of the Office of SBIC Operations thought that, even crediting ELK's position that its

capital impairment percentage "would drop from 40.1% to 39.9%" with a capital infusion, such a

transaction would not be a "sustainable" fix for the company's problems.  A.R. 1762.  The

statement is not the equivalent of a formal agency determination that the cash infusion cured

ELK's ongoing condition of capital impairment.

Third, in a footnote unaccompanied by factual or legal argument, ELK contends that a

solitary entry from a spreadsheet entitled "Regulatory Findings" evidences that "the SBA

considered that ELK had resolved [its condition of capital] impairment as of January 19, 2011."

Pl.'s Reply at 7 n.7.  Courts need not consider cursory arguments of this kind, and the Court

declines to do so here.  *Cf. Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir.

1999) (en banc).  However, even if the Court were inclined to reach the merits of ELK's

argument, ELK's interpretation of the spreadsheet is, to put it generously, disingenuous.  The

referenced entry provides:

| Report Date | Regulation | Regulation Description | Status |
|---|---|---|---|
| 1/6/2011 | 107.1830(e) | Capital Impairment | Violation Resolved on 1/19/2011 |

A.R. 2568.  As ELK is almost certainly aware, the regulation referenced in the spreadsheet entry

describes ELK's duty to "notify SBA promptly if [it is] capitally impaired."  13 C.F.R. §

107.1830(e).  Consistent with this, the dates referenced in the entry correspond with the date the

SBA's Office of SBIC Examinations issued a report finding that ELK failed to *report* its capital

impairment in a timely manner (January 6, 2011) and the date the Office of SBIC Operations

concurred with that finding (January 19, 2011).  A.R. 199, 202.  The entry has no bearing

whatsoever on whether ELK was or was not actually capitally impaired.  It merely reflects ELK's

habitual practice, well grounded in the record, of failing to timely file reports of its financial condition with the SBA.

As a final matter, ELK contends that the SBA acted improperly because it "never threatened" ELK with a possible transfer to the Office of SBIC Liquidation between the time it issued the Cure Letter on July 20, 2010, and the time of the actual transfer on February 23, 2012. Pl.'s Reply at 2.  In other words, ELK faults the SBA for failing to provide ELK with advance notice of the transfer decision.  Although not cited by ELK, the SBA's standard operating procedures do suggest that SBICs should be provided with advance notice of a possible transfer to the Office of SBIC Liquidation in most, but not necessarily all, cases.  *See* SOP 10 06, ch. 9 para. 4.  But ELK does not even endeavor to explain why the SBA was obligated to provide advance notice *in this case*.  Regardless, even assuming, for the sake of argument, that the SBA was somehow required to provide ELK with advance notice of the possible transfer, the record is unequivocal that the SBA in fact did so.  *See* A.R. 800, 1741.  At this procedural posture, the record belies ELK's contention that the SBA "clandestinely" transferred the company to the Office of SBIC Liquidation without prior notice.  Pl.'s Reply at 5.

In the final analysis, ELK was provided with "written notice" of its condition of capital impairment and "at least 15 days to cure."  13 C.F.R. § 107.1810(g).  Indeed, the SBA generously afforded ELK more than one year and seven months to cure its condition of capital impairment before transferring the company to the Office of SBIC Liquidation.  On this record, the Court finds that ELK has failed to demonstrate that it is likely to show that the SBA's decision to transfer the company to the Office of SBIC Liquidation was somehow procedurally defective.

ii.     Substantive Compliance

After affording an SBIC an opportunity to cure, and before transferring the SBIC to the Office of SBIC Liquidation, the SBA must find that the SBIC "cannot or [has] not cure[d]" its condition of capital impairment.  SOP 10 07, ch. 9 para. 2.  In this regard, the record is clear: despite being afforded more than one year and seven months to right the ship, well beyond the fifteen-day minimum cure period, ELK continued to have a condition of capital impairment when the SBA decided to transfer the company to the Office of SBIC Liquidation.  Indeed, ELK's financial condition had only further deteriorated over time, such that the company's capital impairment percentage, marginal at first, had ballooned to approximately 59% at the time of the SBA's transfer decision.  A.R. 1580.  ELK offers no meaningful challenge to the SBA's substantive determination that ELK neither had, nor realistically could, cure its condition of capital impairment.  Determining whether an SBIC has cured, or can cure, a condition of capital impairment requires the exercise of administrative expertise, and the Court shall not lightly second guess the SBA's business determination.  Federal courts are ill-equipped to tread into these waters.  In this case, the SBA's determination is amply supported by the record.  On this record, the Court finds that ELK has failed to establish that it is likely to show that the SBA's decision to transfer the company to the Office of SBIC Liquidation was somehow substantively defective.

At bottom, ELK concedes, as it must, that "[i]f an SBIC becomes capitally impaired, the SBA has the authority under the regulatory scheme to demand that the SBIC come into compliance," and that "[i]f the SBIC is unable to comply within a reasonable time, the SBA has the authority to refer the matter to the Office of Liquidation."  Pl.'s Mem. at 4.  When it comes

43

down to it, the record in this case shows that ELK had a continuing and worsening condition of capital impairment and, despite having more than one year and seven months to do so, failed to satisfactorily cure that condition.  There is, quite simply, no credible argument that the SBA's decision to transfer ELK to the Office of SBIC Liquidation was  procedurally or substantively defective.  Accordingly, the Court finds that ELK has failed to establish that it is likely to succeed on the merits of its claim that the SBA's decision to transfer ELK to the Office of SBIC Liquidation on February 22, 2012 was arbitrary, capricious, or otherwise improper.

2.      The Second Cure Letter and the SBA's March 13, 2012 Letter

ELK next challenges the reasonableness of the SBA's Second Cure Letter, dated March 6, 2012, and the conditions purportedly placed on the Second Cure Letter by the SBA's letter dated March 13, 2012.  ELK's arguments in this regard need not detain the Court long, and the Court addresses them here *seriatim*.

First, ELK suggests that the SBA's Second Cure Letter failed to afford the company a "commercially reasonable" opportunity to cure.  As an initial matter, the Court notes that there is no basis, in statute or regulation, for imposing upon the SBA a requirement that it afford SBICs a "commercially reasonable" opportunity to cure.  Rather, the SBA is only required by regulation to provide an SBIC with "at least 15 days to cure the default(s)."  13 C.F.R. § 107.1810(g)(2)(i).  The SBA has appropriately declined to establish categorical time limits for curing a condition of capital impairment, adopting instead a case-by-case approach that leaves it to the Office of SBIC Operations to exercise "prudent business judgment" based on the particulars of a given case.  SOP 10 06, ch. 5 para. 8(a).  Deciding how much notice is appropriate in a given case requires the exercise of administrative expertise, and the Court shall not lightly second guess how the

SBA exercises its business judgment.  In this case, the critical and undisputed fact is that, by the time the Second Cure Letter was issued, ELK had already been afforded more than one year and seven months to cure its condition of capital impairment and had not done so.  *See* SOP 10 06 ch. 5 para. 8(a) (providing that, when setting a cure period, the SBA may consider "[w]hether corrective action was previously requested").  Despite having ample opportunity to come into compliance, ELK's financial condition had only deteriorated further.  Under these circumstances, the SBA did not act arbitrarily or capriciously in limiting ELK to the regulatory minimum cure period.  Indeed, ELK represented that it could cure within the fifteen-day cure period.  A.R. 1821.  Nor can the Court turn a blind eye to the fact that, with the SBA's voluntary agreement to refrain from further liquidation activities during the resolution of this motion, ELK has now had over a month and a half since the Second Cure Letter was issued and there is still no indication that ELK has any realistic plan for curing its condition of capital impairment.

Second, ELK claims that the Second Cure Letter should have preceded its transfer to the Office of SBIC Liquidation and the SBA's purchase of ELK's debentures from the pooling institution.  This argument fails at the outset because it presupposes that ELK's initial transfer to the Office of SBIC Liquidation was improper, but the Court has already concluded that ELK has failed to show that it is likely to succeed on such a claim.  *See supra* Part V.A.1.  The SBA is only required to provide an SBIC with "written notice" of its condition of capital impairment and to afford the SBIC "at least 15 days to cure the default(s)," 13 C.F.R. § 107.1810(g), and the SBA satisfied these requirements when it issued the Cure Letter on July 20, 2010 and then afforded ELK more than one year and seven months to come into compliance.  The mere fact that ELK was in liquidation when the SBA issued the Second Cure Letter hardly rendered the letter a

"sham," as ELK suggests, Pl.'s Reply at 13, because "the Office of SBIC Liquidation can recommend that a licensee be transferred back to [the Office of SBIC Operations]," SOP 10 06, ch. 9 para 6.

Third, and in a similar vein, ELK contends that the SBA's conduct—transferring ELK to the Office of SBIC Liquidation and purchasing ELK's debentures from the pooling institution—rendered ELK's ability to cure "illusory." Pl.'s Reply at 14. According to ELK, under these circumstances, "no investor would invest in ELK" and "no borrower will borrow from ELK." *Id.* at 22. Once again, ELK's argument fails at the outset because it rests on the false premise that the initial transfer to the Office of SBIC Liquidation was improper. *See supra* Part V.A.1. More to the point, despite ELK's apparent belief to the contrary, the SBA is not required to create the conditions for an SBIC's ability to cure an event of default. Faced with ELK's threats of litigation, the SBA voluntarily agreed to refrain from further liquidation activities and it issued the Second Cure Letter to generously afford ELK yet another opportunity to cure its condition of capital impairment (an opportunity to which ELK would not have been entitled absent the SBA's voluntary agreement). In so doing, the SBA was not obligated to take any affirmative measures that might assist ELK in securing the private capital the company needed to cure its condition of capital impairment.[25]

Fourth, ELK argues most forcefully that the SBA's March 13, 2012 letter "sets at least five legally impermissible conditions to cure." Pl.'s Mem. at 23. Despite ELK's fervent protestations to the contrary, the SBA's March 13, 2012 letter did no such thing, but instead

---

[25] Indeed, ELK does not even identify with any measure of exactitude what those affirmative measures might be. Presumably, however, they include somehow devolving the company's debentures to the pooling institution, but ELK does not explain how that could be done.

merely provided ELK with preliminary feedback on the company's plan to deliver binding

commitment letters to the SBA for its consideration.  The SBA's letter unambiguously provided

that, "[a]t this time, SBA cannot determine whether [the company's] proposed cure [would]

satisfactorily resolve [its] condition of Capital Impairment."  A.R. 1833.  Although the SBA

provided ELK with some guidance as to its stated plan, the SBA clearly stated that it could not,

at that time, render a final decision, and instructed ELK to submit additional information,

including the fully executed binding commitment letters and an updated capital certificate.  A.R.

1833.  As a consequence, the SBA's March 13, 2012 letter simply does not constitute "final

agency action" subject to judicial review.  5 U.S.C. § 704; *see also Nat'l Ass'n of Home Builders*

*v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) ("[T]he action under review must mark the

consummation of the agency's decisionmaking process—it must not be of a merely tentative or

interlocutory nature.") (internal quotation marks omitted).  And because ELK never carried out

its proposal, the SBA was never placed in the position of having to make a final determination on

these issues.

In the end, ELK has failed to proffer a colorable basis for concluding that either the

SBA's Second Cure Letter or its letter dated March 13, 2012 were arbitrary, capricious, or

otherwise improper.  Accordingly, the Court finds that ELK has failed to establish that it is likely

to succeed on the merits of this claim.

* * *

In meeting the requisite burden for injunctive relief, "[i]t is particularly important for the

movant to demonstrate a likelihood of success on the merits."  *Konarski v. Donovan*, 763 F.

Supp. 2d 128, 132 (D.D.C. 2011).  In the final analysis, ELK has failed to meet that burden here.

47

As a result, this factor weighs against the issuance of a preliminary injunction.

### B. Irreparable Injury, the Public Interest, and the Balance of the Equities

ELK bears the burden of "demonstrat[ing] that irreparable injury is *likely* in the absence

of an injunction," and not a mere possibility. *Winter*, 552 U.S. at 22 (emphasis in original). The

injury identified must "be both certain and great; it must be actual and not theoretical."

*Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). In

this regard, ELK offers various reasons why it believes that it will be injured in the absence of a

preliminary injunction, but there is a common defect affecting them all.[26] Regardless of what one

might believe about the propriety of suspending liquidation activities during the pendency of this

action, about enjoining the SBA from taking any action that would affect ELK's status a

corporate licensee, or about requiring the SBA to provide ELK even more time to cure its

condition of capital impairment, the simple fact is that ELK still has not presented the SBA or

this Court with a concrete plan for curing its condition of capital impairment. True, ELK

suggests that it intends to take the time afforded by a preliminary injunction to seek commitment

letters reflecting sufficient funds to bring its capital impairment percentage to 40% or lower, but

it offers no credible explanation why it would be able to successfully do so if afforded additional

time when it has not been able to do so to date. To the extent ELK's optimism rests on its

suggestion that the Court should take the unusual step of commanding the SBA to issue a public

statement that the SBA will not accelerate ELK's payment on its debentures, ELK offers only its

naked speculation that such a step would be sufficient to restore market confidence so that ELK

---

[26] Parenthetically, the Court also notes that, although by no means dispositive, the fact that ELK has asserted and intends to pursue claims for monetary damages undercuts its argument that, absent the equitable relief of a preliminary injunction, it will have no adequate remedy in law.

could secure the funding it needs to cure.[27]  This is especially troubling because the record is

clear that ELK's overall financial condition has consistently eroded over the past two

years—something that is certain to be a major factor in shaping market perception.  ELK simply

has failed to explain to this Court's satisfaction that the "extraordinary relief" that it has

requested would even make a meaningful difference at the end of the day.  *Winter*, 555 U.S. at

21.

Turning to the categories of alleged harms identified by ELK, with one exception

discussed in greater detail below, the Court is not persuaded that ELK is likely to suffer

irreparable injury in the absence of preliminary relief.  First, ELK asserts that the SBA's conduct

is violative of its procedural rights, but courts generally "will not base a finding of 'irreparable

injury' on a procedural violation standing alone" and "any putative procedural violation . . .

[could] be remedied by a decision on the merits."  *Am. Ass'n for Homecare v. Leavitt*, 2008 WL

2580217, at *5 (D.D.C. June 30, 2008) (internal numbering omitted).  Second, ELK claims that it

will suffer injury to its goodwill, market reputation, and creditworthiness, but even assuming,

*arguendo*, that such harms are cognizable under the "irreparable injury" standard, their

immediate impact has already been felt and hence "a preliminary injunction here would be very

much like locking the barn door after the horse is gone."  *Marcy Playground, Inc. v. Capitol*

*Records, Inc.*, 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998).  Again, ELK has not provided a non-

speculative basis for concluding that the issuance of a preliminary injunction is likely to

meaningfully improve its perception in the marketplace.  Third, although ELK correctly observes

---

[27]  Moreover, requiring the SBA to make such an affirmative statement would constitute the sort of
mandatory relief altering the status quo that is generally disfavored.  *See Allina Health Servs. v. Sebelius*, 756 F.
Supp. 2d 61, 69 (D.D.C. 2010).

that it may be required to comply with the requirements applicable to new licensees if it is able to secure a transfer back to the Office of SBIC Operations and thereby exit liquidation, *see* SOP 10 06, ch. 9 para. 6, whether or not ELK will ever be able to meet the other conditions for exiting liquidation remains entirely speculative at this point.

Nonetheless, the Court is not oblivious to the fact that there are real consequences stemming from ELK's transfer to the Office of SBIC Liquidation.  It should go without saying that a transfer to the Office of SBIC Liquidation necessarily brings with it a greater risk of actual liquidation, something that would obviously affect ELK's ability to exist in its current form as an ongoing concern.  Once the parties' standstill agreement expires after April 25, 2012, the SBA will be free to continue the process of liquidation, which may include accelerating ELK's payment on its debentures by declaring the company's entire indebtedness "immediately due and payable," 13 C.F.R. § 107.1810(g)(1)(i), and instituting proceedings for the appointment of the SBA or its designee as ELK's receiver, *id.* § 107.1810(g)(1)(ii).  Liquidation is not inevitable and therefore somewhat conjectural at this point, *see* SOP 10 06, ch. 9 para. 6, but given ELK's current financial condition and past inability to cure its condition of capital impairment, there is a sufficiently concrete risk that ELK will most likely be subject to further liquidation proceedings absent preliminary relief.

Even accepting this showing, however, the Court finds that the irreparable harm ELK might suffer in the absence of a preliminary injunction is outweighed by the public interest. Today, the SBA holds approximately $21,715,000 of outstanding debentures that were issued by ELK between July 2002 and December 2009, and approximately $5,000,000 will be due within the next ten months.  A.R. 14, 1720.  These are substantial figures, and they represent public

50

monies that have been extended to ELK, a private entity, with the ultimate aim not of encouraging ELK's individual growth but rather the growth of small businesses generally.[28]  The primary goal of the Office of SBIC Liquidation is to maximize net recoveries in liquidation, taking into consideration the time value of money, and furthering the integrity of the SBIC program while recognizing the interests of affected parties.  *See* SOP 10 07, ch. 1 para. 4(a). Permitting an SBIC like ELK to delay the liquidation process during the pendency of litigation would constitute a significant interference with the SBA's ability to protect its leverage position and to recover public funds from failing institutions.  Such an outcome would, if not eviscerate, then at the very least severely undermine the SBA's ability to function as a market actor and make the sort of adroit business decisions that Congress envisioned when it launched the agency into the commercial world.  The equities do not favor such an outcome where, as here, an SBIC has already been afforded a meaningful opportunity to cure its default and has failed to do so or even show that there is a realistic possibility that it will be able to do so.  Accordingly, even taking into account the harm ELK might suffer in the absence of a preliminary injunction, the Court finds that the public interest and the balance of the equities weigh against the issuance of a preliminary injunction.

/

/

/

/

---

[28]  There is no reason to believe that small businesses will be materially affected by ELK's absence from the marketplace, which is already part of the status quo because ELK concedes that "no borrower will borrow from ELK today."  Pl.'s Reply at 22.  Other SBICs remain available to provide funding to small businesses, and small businesses may of course still look to borrow from more traditional sources.

## VI.  CONCLUSION

The Court has considered the remaining arguments tendered by ELK and has concluded that they are without merit.  Considering the record as a whole, the Court finds that ELK has failed to make a "clear showing" that it is entitled to the "extraordinary remedy" of a preliminary injunction.  *Winter*, 555 U.S. at 21.  Accordingly, ELK's [3] Motion for Preliminary Relief shall be DENIED.  The SBA shall file a pleading responsive to ELK's [1] Complaint by no later than **June 4, 2012**.  An appropriate Order accompanies this Memorandum Opinion.

Date:   April 24, 2012

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge