**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ELK ASSOCIATES FUNDING CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 12-0438 (CKK) |
| | ) | |
| UNITED STATES SMALL BUSINESS | ) | |
| ADMINISTRATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR LEAVE TO SERVE DISCOVERY

William S. Heyman (D.C. Bar # 47345)
Don P. Foster (admitted *pro hac vice*)
Offit Kurman, P.A.
8171 Maple Lawn Blvd, Suite 200
Fulton, Maryland  20759
(443) 738-1593 (phone)
(443) 738-1535 (facsimile)
wheyman@offitkurman.com
dfoster@offitkurman.com

Justin V. Shur (D.C. Bar # 973855)
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
jshur@mololamken.com

*Attorneys for Elk Associates Funding Corporation*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

ARGUMENT .........................................................................................................................3

I.     ELK IS ENTITLED TO DISCOVERY ON ITS APA CLAIMS.......................................3

       A.     ELK Has Made a Strong Showing of Bad Faith and Improper Behavior ..............4

       B.     ELK Is Entitled to Discovery To Address Gaps in the Record as Well as
              SBA's Apparent Failure To Consider Relevant Factors or Adequately Explain
              Its Decision ........................................................................................................10

II.    ELK IS ENTITLED TO DISCOVERY ON ITS CONSTITUTIONAL CLAIMS ...........15

       A.     ELK Is Entitled to Discovery To Address Its Due Process Claim That It
              Was Entitled to But Did Not Receive a Decision by an Unbiased
              Decisionmaker ...................................................................................................15

       B.     ELK's Proposed Discovery Is Narrowly Tailored.................................................17

CONCLUSION.....................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adair v. Solis*, 742 F. Supp. 2d 40 (D.D.C. 2010), *aff'd*, 473 F. App'x 1
(D.C. Cir. 2012) ...................................................................................................16

*Charlton Mem'l Hosp. v. Sullivan*, 816 F. Supp. 50 (D. Mass. 1993) ..........................16

*Ecology Ctr., Inc. v. Gorman*, 902 F. Supp. 203 (D. Mont. 1995) ................................4

*Elk Assocs. Funding Corp. v. U.S. Small Business Admin.*, — F. Supp. 2d — ,
2012 WL 1403375 (D.D.C. 2012) ......................................................................1

*Grill v. Quinn*, No. CIV S-10-0757, 2012 WL 174873 (E.D. Cal. Jan. 20,
2012) .................................................................................................................5, 16

*Hall v. Clifton Precision*, 150 F.R.D. 525 (E.D. Pa. 1993) ......................................20

*Harvard Pilgrim Health Care of New England v. Thompson*, 318 F. Supp.
2d 1 (D.R.I. 2004) .............................................................................................16

*IMS, P.C. v. Alvarez*, 129 F.3d 618 (D.C. Cir. 1997) ...................................................4

*James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996) ...............6, 7

*Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, No. 86-2542, 1987 WL 11994
(D.D.C. May 26, 1987) ......................................................................................20

*Milligan v. Clinton*, 266 F.R.D. 17 (D.D.C. 2010) .....................................................18

*Nat'l Med. Enters., Inc. v. Shalala*, 826 F. Supp. 558 (D.D.C. 1993),
*aff'd*, 43 F.3d 691 (D.C. Cir. 1995) .........................................................3, 15, 16

*Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150 (D.D.C. 2012) ...............................3

*Neighborhood Assistance Corp. of Am. v. U.S. Dep't of Housing and Urban Dev.*,
No. 11-cv-1312, 2011 WL 3611461 (D.D.C. Aug. 17, 2011) ..........................4

*Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979) .......................................................15

*Rydeen v. Quigg*, 748 F. Supp. 900 (D.D.C. 1990) ....................................................15

*Schaghticoke Tribal Nation v. Norton*, 3:06CV81, 2006 WL 3231419
(D. Conn. Nov. 3, 2006) ......................................................................................4

*Slockish v. United States Federal Highway Administration*, No. CV-08-1169,
2011 WL 7167042 (D. Or. Sept. 21, 2011) ......................................................16

*Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276 (W.D. Wis. 1997) ...............................4

*Withrow v. Larkin*, 421 U.S. 35 (1975)................................................................................16

*Woerner v. United States Small Business Administration*, No. 89-2674,
    1991 U.S. Dist. LEXIS 3014 (D.D.C. Mar. 12, 1991)............................................................4

## STATUTES, REGULATIONS, REGULATORY MATERIALS, AND RULES

15 U.S.C. § 681 ........................................................................................................................5

13 C.F.R. § 107.100 ..................................................................................................................5

13 C.F.R. § 107.150(b)(1)..........................................................................................................9

13 C.F.R. § 107.150(b)(2)..............................................................................................9, 10, 12

65 Fed. Reg. 49,511 (Aug. 14, 2000).........................................................................................9

Fed. R. Civ. P. 26(d)(1)............................................................................................................18

Fed. R. Civ. P. 56(d) ...........................................................................................................17, 18

## OTHER AUTHORITIES

Brief of Appellee, *Nat'l Med. Enters., Inc. v. Shalala*, 43 F.3d 691 (D.C. Cir. 1995)
    (No. 93-5247)......................................................................................................................15

7 Moore *et al.*, *Moore's Federal Practice* (3d ed. 2012)............................................................20

SBA, *SBIC TechNotes Number 13* (2009), http://www.sba.gov/content/sbic-technotes-
    number-13-march-2009 .......................................................................................................8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

ELK ASSOCIATES FUNDING CORP.,                )
                                             )
                        Plaintiff,           )
            v.                               )        Case No. 12-0438 (CKK)
                                             )
UNITED STATES SMALL BUSINESS                 )
ADMINISTRATION, et al.,                      )
                                             )
                        Defendants.          )
———————————————————————)

**PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF
ITS MOTION FOR LEAVE TO SERVE DISCOVERY**

ELK respectfully submits this reply memorandum in further support of its Motion for Leave to Serve Discovery.

**INTRODUCTION**

Contrary to SBA's contentions, this motion seeks to "re-litigate" nothing.  *See* Opp. at 1. To be sure, this Court denied ELK's preliminary injunction motion based on its determination that ELK had offered only "conclusory and speculative assertions" in support of its allegations that SBA had acted in bad faith.  *Elk Assocs. Funding Corp. v. U.S. Small Business Admin.*, — F. Supp. 2d — , 2012 WL 1403375, at *18 (D.D.C. 2012).  Based on that conclusion, this Court held that ELK was not entitled to the "'extraordinary remedy' of a preliminary injunction." *Id.* at *26.

But that preliminary conclusion, rendered nearly six months ago, has now been overtaken by facts.  Since that time, SBA has **conceded** that it prefers SBICs with a limited-term lifespan, rather than an evergreen or indefinite life structure.  It has **admitted** that SBIC licenses have been issued **only** to limited-life limited partnerships in the past eleven years.  And two former Directors of the Office of SBIC Operations—Ronald Cibolski and Walter Peterson—have

submitted sworn declarations in support of ELK's claim that SBA acted in bad faith here. Under the well-established law of this Circuit, the presence of those facts is more than sufficient to permit the modest discovery ELK seeks. Indeed, if sworn statements from two former SBIC Office Directors that partially open the black box of SBA's decisionmaking processes are not sufficient to entitle a litigant to discovery, it is difficult to imagine what would be. SBA would apparently have this Court believe that ELK is not entitled to discovery unless a current member of SBA openly declares that SBA acted in bad faith. That is not the law. SBA's attempt to dismiss the declarations of these former high-level SBA officials and minimize the import of its own admissions of bias is unpersuasive.

Notwithstanding SBA's contrary arguments, the Administrative Record also contains a number of troubling omissions and fails to reflect SBA's consideration of multiple critical issues. For example, SBA now claims that it rejected the CN Transaction not because ELK's parent company, Ameritrans, failed to qualify as a traditional investment company (SBA now concedes that Ameritrans *did* so qualify) but because an investor in Ameritrans (CN) did not. But that newfound litigation position was not cited to ELK as a reason for rejecting the CN Transaction and it is flatly contrary to the governing regulation in any event. While the Record does not contain any meaningful analysis of whether CN itself qualified as a traditional investment company, one SBA official unilaterally concluded that it *did* qualify. SBA's opposition fails to provide a meaningful response to these and other significant gaps. ELK is thus entitled to discovery on its APA claims for these additional reasons as well.

Even if ELK were not entitled to discovery on its APA claims, it is entitled to discovery on its constitutional claims. "[A] court's review of a constitutional claim" is an "exception[ ]" to the rule that "the focal point for judicial review should be the administrative record already in

existence." *Nat'l Med. Enters., Inc. v. Shalala*, 826 F. Supp. 558, 565 n.11 (D.D.C. 1993), *aff'd*, 43 F.3d 691 (D.C. Cir. 1995). The handful of out-of-circuit district court decisions SBA cites for its contrary position do not warrant a different result. The constitutional claims here are substantial, and are based on an allegation that SBA acted with actual bias in violation of ELK's due process rights, including the right to an unbiased decisionmaker. ELK's constitutional claims are thus not simply dressed-up APA claims, and ELK is entitled to discovery on them regardless of how this Court resolves this motion as to the APA claims. ELK's discovery requests, moreover, are narrowly tailored. They seek to further uncover SBA's bad faith and improper behavior, and to address the gaps ELK has identified in the Administrative Record.

Because ELK has demonstrated that it is entitled to discovery on its APA and constitutional claims, its motion should be granted.

## ARGUMENT

## I.   ELK IS ENTITLED TO DISCOVERY ON ITS APA CLAIMS

As ELK explained in its opening memorandum, the general principle that judicial review under the APA is limited to the Administrative Record is subject to a number of exceptions, the applicability of which are at their "zenith when extra-record evidence is needed to facilitate examination of the procedural soundness of an agency decision." *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150, 157 (D.D.C. 2012). Multiple exceptions apply in this challenge to the SBA's decision to refer ELK to Liquidation. ELK Mem. at 5-13. Notwithstanding SBA's contentions, ELK's evidence of bad faith and improper behavior—which includes, among other things, SBA's own admissions of a preference against the corporate form as well as declarations submitted by a former Director of SBA's Office of SBIC Operations that current members of SBA's Investment Committee seek to oust corporate SBICs—is more than sufficient to warrant

discovery.   Similarly, SBA's opposition memorandum fails to meaningfully address the significant gaps in the Administrative Record identified in ELK's opening memorandum. Discovery is warranted on both grounds.

A.     **ELK Has Made a Strong Showing of Bad Faith and Improper Behavior**

Courts may consider extra-record evidence when there is a showing that the agency has "acted in bad faith" or "engaged in improper behavior." *See, e.g.*, *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997); ELK Mem. at 9.  SBA is correct that "conclusory assertions" of bad faith are insufficient.  Opp. at 18.  But a litigant does not have to prove beyond all doubt that an agency acted in bad faith; only a "preliminary showing" is required.  *See, e.g.*, *Neighborhood Assistance Corp. of Am. v. U.S. Dep't of Housing and Urban Dev.*, No. 11-cv-1312, 2011 WL 3611461, at *2 (D.D.C. Aug. 17, 2011).  In *Neighborhood Assistance*, for example, the plaintiff claimed that the government had targeted it in retaliation for its criticism of administration policies.  *Id.* at *1.  This Court permitted the plaintiff to take four depositions of HUD officials to explore allegations of bad faith after the plaintiff's CEO submitted an affidavit detailing statements made by auditors and HUD officials reflecting that HUD was targeting it.  *Id.*  Case after case across the nation similarly illustrate that a smoking gun is not required before discovery may be allowed.  *See, e.g.*, *Woerner v. United States Small Business Administration*, No. 89-2674, 1991 U.S. Dist. LEXIS 3014, at *4 (D.D.C. Mar. 12, 1991); *Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1282-84 (W.D. Wis. 1997); *Ecology Ctr., Inc. v. Gorman*, 902 F. Supp. 203, 205 (D. Mont. 1995); *Schaghticoke Tribal Nation v. Norton*, 3:06CV81, 2006 WL 3231419, at *5-6 (D. Conn. Nov. 3, 2006).  This is particularly true when the underlying claim is that the agency either based its decision on impermissible grounds or exhibited bias.  As one court has explained, "[b]ias, if any, is likely to be found in documents not part of the record,

4

if any, which demonstrate the 'real' reason for the decision at issue." *Grill v. Quinn*, No. CIV S-10-0757, 2012 WL 174873, at *5 (E.D. Cal. Jan. 20, 2012).

Under these principles, the evidence of bad faith ELK submitted is more than sufficient to warrant discovery. After this Court decided ELK's preliminary injunction motion, SBA admitted that it "generally prefers that SBICs have a planned 10-15 year lifespan, rather than an evergreen or indefinite life structure." Answer ¶ 88. Discovery is warranted on that basis alone. Nowhere in the relevant statute or regulation is there a preference for SBICs with limited terms, rather than evergreen or indefinite life structures. *See* 15 U.S.C. § 681; 13 C.F.R. § 107.100. ELK is entitled to discovery to further uncover SBA's policy to discriminate against existing corporate SBICs like ELK and explore whether SBA did in fact improperly discriminate against ELK based on that policy.

Even if SBA's concession did not on its own warrant discovery, this Court now has the benefit of two declarations from former high-level SBA officials supporting ELK's argument that SBA acted improperly and in bad faith in its treatment of ELK. ELK has offered the declaration of Ronald Cibolski, a consummate SBA insider who served as Director of SBA's Office of SBIC Operations and previously sat on SBA's Investment Committee. Cibolski Decl. ¶¶ 4-5. He was also one of the select group of individuals personally responsible for drafting and implementing the MOD regulations at issue in this litigation. *Id.* ¶ 8. Based on his "personal knowledge of the policies and practices" of SBA, *id.* ¶ 2, and "on [his] knowledge of the Investment Committee and its members", *id.* ¶ 14, Mr. Cibolski declared that "another motivation factored in the decision to" transfer ELK to liquidation, *id.*, and "that members of the current Investment Committee disfavor [corporate SBICs] and . . . have attempted to eliminate [corporate] SBICs," *id.* ¶ 16. ELK has also offered the declaration of Walter Peterson, former

Acting SBIC Office Director.  Mr. Peterson declared that SBA's rejection of two transactions that would have cured ELK's condition of capital impairment "directly contravened its own regulations," Peterson Decl. ¶ 25, and that other purported concerns SBA expressed "had no basis in SBA's established practices or in the Administrative Record." *id.* ¶ 26.  The Cibolski and Peterson declarations independently provide the requisite showing of bad faith or improper behavior to warrant discovery.

SBA's efforts to avoid discovery based on its alleged bad faith and improper behavior all fail.  SBA relies heavily on the D.C. Circuit's decision in *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996), to urge that discovery is not warranted here.  *See* Opp. at 18-21.  In *James Madison*, a bank holding company brought suit against the Office of the Comptroller of the Currency and the Federal Deposit Insurance Corporation after it was declared insolvent and an FDIC receiver was appointed.  *Id.* at 1090.  The plaintiff claimed that the OCC examiners had acted in bad faith when they declared it insolvent.  *Id.*  In support of this allegation, the plaintiff relied on affidavits from two of its former officers and a consultant it had retained.  *Id.* at 1095.  Those affidavits "stated that 'it appeared' from [bank] examiners' hostile attitudes, their unwillingness to correct errors, and the 'severity' of the required reserves, that the examiners were 'expected,' 'instructed,' or had a 'predetermined agenda' to render the" plaintiff insolvent.  *Id.*  The D.C. Circuit concluded that, if true, such bad faith "would be material to determining whether the Government acted arbitrarily."  *Id.* at 1096.  But it concluded that "these conclusory statements" were insufficient to raise an actual issue as to the agency's bad faith.  *Id.*

*James Madison* is not on point.  The affidavits on which the plaintiff in *James Madison* relied came from the plaintiff's **own** former officers and a hired consultant.  None of the affiants were employed by the relevant governmental agencies or had any personal knowledge to support

their claims of bias.   Rather, the affidavits consisted of nothing more than the affiants'
unsupported speculation that "it appeared" that the examiners were acting pursuant to a
"predetermined agenda."  82 F.3d at 1095.  Of course discovery is not allowed in that scenario.
Here, however, ELK has offered declarations of two former high-level **SBA** officers.  And, in
those sworn declarations, they provide information, ***based on personal knowledge***, supporting
ELK's claim that SBA is biased against corporate SBICs.

SBA's other attempts to minimize the import of these declarations is unavailing.  SBA
claims that, because Mr. Cibolski left SBA in 2003, he was not privy to SBA's internal
decisionmaking process, including any deliberations concerning ELK.  Opp. at 18-19.  But that
contention misses the mark because Mr. Cibolski left SBA *after* the alleged unwritten policy to
eliminate corporate SBICs was implemented.  And Mr. Cibolski's declaration makes clear "that
members of the ***current*** Investment Committee" disfavor corporate SBICs and seek to eliminate
them from the SBIC program.  Cibolski Decl. ¶ 16.  That sworn declaration, based on Mr.
Cibolski's personal knowledge of the biases of ***current*** Investment Committee members that he
acquired while observing them during his decade-long tenure as Director of the Office of SBIC
Operations, supports ELK's claim that SBA's decisionmaking process was influenced by bias
and bad faith.[1]

SBA also suggests that its acknowledged preference for limited-life SBICs in the
application process "is not evidence of a policy to oust existing corporate SBICs."  Opp. at 21.
But those two concepts are not analytically distinct.  SBA uniformly disfavors the corporate form

---

[1] SBA never suggests that the individuals with decisionmaking authority concerning ELK's
referral to Liquidation were not at SBA when Mr. Cibolski was Director of the Office of SBIC
Operations.  Nor could it.  SBA's own declarant, Margaret Dennin, acknowledges for example
that she has been Chief Administrative Officer of SBA's Investment Division since 1999.  *See*
Dennin Decl. ¶ 3.

precisely because it does not want corporate SBICs as part of the SBIC program.  Indeed, SBA

has explicitly advised applicants to use limited-life entities:  "SBA generally prefers SBICs that

have a planned 10-15 year lifespan, rather than an evergreen or indefinite life structure."  *See*

SBA, *SBIC TechNotes Number 13* (2009), http://www.sba.gov/content/sbic-technotes-number-

13-march-2009.  It defies common sense to contend that SBA's acknowledged bias in favor of

limited-life SBICs provides no support for ELK's contention that SBA has a bias against

preexisting corporate SBICs; the two are inextricably intertwined.  In any event, as discussed

above, Mr. Cibolski declared that current members of the Investment committee *do* seek to oust

existing corporate SBICs from the program.  Discovery could further reinforce that claim.  For

example, a comparison of the attrition rate for preexisting corporate SBICs as compared to their

non-corporate counterparts over the same time period would be directly relevant to ELK's

position that SBA has an unwritten policy to drive corporate SBICs out of the program.  Mr.

Cibolski's sworn statements, coupled with SBA's own admissions, are sufficient to warrant the

limited discovery ELK has requested.[2]

SBA's response to Mr. Peterson's declaration fares no better.  In response to criticism

from Mr. Peterson and ELK concerning its rejection of the CN Transaction, SBA now

acknowledges that Ameritrans qualified as a traditional investment company, but claims that the

transaction nonetheless ran afoul of the MOD requirements "indirectly."  Opp. at 9.  Specifically,

SBA reasons that: (1) Because CN owned more than 70% of Ameritrans and Ameritrans owned

---

[2] SBA downplays the fact that SBIC licenses have been issued solely to limited life partnerships since 2001 by alleging that there were no corporate applicants for such licenses during this period.  *See* Opp. at 21.  But even if that were true, it is irrelevant because SBA *admits* that it has a preference for limited-life SBICs.  *See id.*  And SBA's claim that its preference against the corporate form is shared by the marketplace, *id.*, confuses cause with effect:  It is hardly surprising that applicants do not want to spend the time or money to attempt to obtain licensure as corporate SBICs, when SBA itself has made clear that it disfavors the corporate form.

more than 70% of ELK, **both** CN and Ameritrans were required to qualify as traditional investment companies; and (2) CN "was not itself (and never claimed to be) a traditional investment company." *Id.* at 9-10.

Both of these assertions are false, and demonstrably so. As to the first, SBA's argument is contrary to the text of 13 C.F.R. § 107.150. Section 107.150(b)(1) states that an entity cannot, "directly or indirectly," control more than 70% of an SBIC *"[e]xcept as provided in paragraph (b)(2)*." 13 C.F.R. § 107.150 (emphasis added). Paragraph (b)(2), in turn, states that "an investor that is a **traditional investment company** . . . **may own and control more than 70 percent** of" an SBIC. *Id.* § 107.150 (emphasis added). Section 107.150(b)(2) makes no reference to indirect ownership.

Nor would such a reference make any sense. As SBA itself explained when it promulgated the traditional-investment-company exception, "there may be categories of investors **who can be permitted to own in excess of 70% of an SBIC** without destroying the SBIC's management-ownership diversity," and "**one such category is the traditional investment company**." 65 Fed. Reg. 49,511, 49,512 (Aug. 14, 2000) (emphasis added). "A subsidiary SBIC of such a traditional investment company," SBA noted, "can offer meaningful management-ownership diversity even if the investment company owns substantially all of the SBIC." *Id.* That is so because it "has managers who are largely unrelated to and unaffiliated with the investors in the firm," and "the managers of a traditional investment company and its subsidiary SBIC are properly authorized and motivated to make investments that, in their independent judgment, are likely to produce significant returns to all investors in the investment company and in the SBIC." *Id.* In other words, there is no reason to "look through" a traditional investment company because the structure of such a company provides all of the protections the MOD

9

requirements are intended to serve.  Both the plain meaning of the regulation and SBA's own explanation for the regulation thus demonstrate that, when more than 70% of an SBIC—here, ELK—is owned by a traditional investment company—here, Ameritrans—the exception in Section 107.150(b)(2) has been satisfied.

Even if SBA were permitted to look through Ameritrans—and it is not—nothing in the Administrative Record demonstrates that SBA ever found that CN is not a traditional investment company.  To the contrary, on August 16, 2011, Marja Maddrie at SBA opined in an email that "[o]n its face, it looks as though CN **would be an excepted investment company**."  AR 980 (emphasis added).  Whether CN ever "claimed to be" a traditional investment company, Opp. at 9; *see also* AR 980, is irrelevant.  Setting aside the fact that CN, Ameritrans, and ELK never had any reason to believe such a claim was necessary—since the plain text of Section 107.150(b)(2) imposes no such requirement—SBA had an obligation to determine whether CN qualified as a traditional investment company.  As Mr. Peterson explained, "whether a company qualifies as a 'traditional investment company' is based on whether the company objectively meets traditional investment company criteria, not whether it 'claims' to be one."  Peterson Decl. ¶ 24.  SBA's failure to conduct any analysis of whether CN qualified as a traditional investment company before rejecting the CN Transaction confirms that this professed concern was simply a pretext used to reach a predetermined result.

**B.      ELK Is Entitled to Discovery To Address Gaps in the Record as Well as SBA's Apparent Failure To Consider Relevant Factors or Adequately Explain Its Decision**

In its opening memorandum, ELK noted multiple critical areas that are either entirely absent from or insufficiently referenced in the Administrative Record as produced by SBA.  ELK

Mem. at 7-8.  Although SBA asserts that "the 'gaps' that ELK alleges simply do not exist," *id.* at 7, SBA's responses fail to address the fundamental problems ELK identified.

First, SBA suggests that ELK "mischaracterizes the record" by alleging that SBA initially greeted the first CN Transaction with approval and then changed its position; instead, SBA argues, the record shows only that "SBA staff recommended to the Investment Committee that the proposal be given further consideration and noted certain strengths of the proposal."  Opp. at 8.  But it is SBA that is mischaracterizing the record on this point.  An SBA official wrote in a May 3, 2011 memorandum to the Investment Committee that "[i]t is recommended that the Licensee be allowed to pursue the proposed change of ownership and control that will result in the infusion of additional capital resulting in a cure of the Licensee's Condition of Capital Impairment."  AR 433.  The recommendation memorandum did not identify any concerns related to ELK's management team (which, as Mr. Peterson notes, have no basis in any event, *see* Peterson Decl. ¶ 27).  Nor did the memorandum identify any of the other issues SBA now invokes in litigation to justify denying the transaction.  And on July 13, 2011, Harry Haskins (the Deputy Associate Administrator of SBA's Investment Division) indicated that, although there were "details that need scrutiny," "the overall concept [was] beneficial to the program and ELK" and he was thus "in favor of allowing the proposal to proceed."  AR 717.  Although SBA is correct that the Administrative Record reflects that SBA had different views just months later, *see* AR 1572, the record does not reflect why SBA changed its position.  ELK is entitled to discovery to fill this critical gap.

Second, SBA disputes ELK's claim that the Administrative Record contains no justification for why SBA rejected applying the traditional investor exception to the CN Transaction.  SBA now claims that it did so, not because it doubted that Ameritrans qualified as

a traditional investment company, but because **CN** did not so qualify.  Opp. at 9.  But that purported reason is contrary to the plain text of the governing regulation.  *See* pp. 9-10, *supra*. And although SBA cites the Investment Committee's July 12 and July 14, 2011 minutes to show that it rejected applying the traditional investor exception on that basis, the notes from these meetings do not so much as mention the exception, much less indicate that CN would have to qualify as a traditional investment company for it to apply.  *See* AR 710-11, 942.  The only other evidence SBA offers to show that this was the basis for its rejection are two pages of cryptic, partially illegible handwritten meeting notes that refer to, among other things, a need to "look through."  AR 1023-24.  If SBA's current litigation position were truly the basis for SBA's decision, one would expect the record to reflect *some* analysis finding that CN did not in fact qualify as a traditional investment company.  But there is no such finding.  Nor could there be one, as even a cursory examination of CN's business illustrates.[3]  ELK is entitled to fill in the gaps in the Administrative Record to uncover the process by which SBA came to its conclusion that the traditional-investor exception in Section 107.150(b)(2) did not apply.

Third, SBA contends that Mr. Salgado's February 16, 2012 voice message to Mr. Feinsod is consistent with the record.  Opp. 13-14.  SBA is incorrect, as a plain reading of the message— which SBA tellingly does not quote—demonstrates.  As Mr. Salgado then explained, "the primary reason" for rejecting the BDC Transaction "was that they could not, um, understand why [BDC Investor] would want to, uh, get a SBA license by acquiring uh . . . uh distressed SBIC"

---

[3] For example, as CN's website notes, the company manages "over $15.0 billion of assets," with "a broad investment mandate" that "takes a value-oriented, long-term view to investing and seeks consistent returns."  *See* http://www.columbusnova.com/.  CN is plainly "a professionally managed firm organized exclusively to pool capital from more than one source for the purpose of investing in businesses that are expected to generate substantial returns to the firm's investors." *See* 13 C.F.R. § 107.150(b)(2).  Besides, as noted above, whether CN or any other entity aside from Ameritrans is a traditional investment company has no bearing on this case.

and that "you know, if [BDC Investor] would like to get an SBIC they can apply in on their own." Feinsod Decl. ¶ 37 (emphases omitted). As this language shows, Mr. Salgado did not "convey[] essentially the same points" reflected in the Administrative Record "using different language." Opp. at 14. Rather, the clear import of Mr. Salgado's message was that the BDC Transaction would not be approved because SBA had made a categorical judgment that it would not make sense for an investor to invest in a "distressed SBIC" when such an investor could instead "apply in on their own." Contrary to SBA's newfound litigation position, this reason is fundamentally different than the other purported grounds set forth in the Administrative Record.[4]

Fourth, as to the March 6, 2012 letter, SBA contends that the Administrative Record reflects that SBA sent ELK the letter in response to ELK's threat of litigation. Opp. at 14-15. But that response misses the point. SBA claims that ELK had been in a continuing state of capital impairment since March 31, 2010 and that the issuance of a new letter was simply an "accommodation to ELK." Opp. at 15. ELK's declarant, by contrast, claims that "ELK was extremely reasonable in believing that the default clock" was no longer running from the earlier letter. Peterson Decl. ¶ 19. ELK's point is simply that there is nothing in the Administrative Record reflecting that the March 6, 2012 letter was a mere accommodation, nor any evidence showing that SBA ever issues "reminder" or "accommodation" letters that are styled as formal

---

[4] As ELK explained in its opening brief, the stated reasons for rejecting the BDC Transaction (and the $10 million capital infusion it would have brought) are also insufficient and lack any persuasive explanation in the record. *See* ELK Mem. at 7, 12, 13. Such an infusion "would have reduced ELK's Capital Impairment from 59.0% to 34.6% as of September 30, 2011," a reduction of more than 40%. Peterson Decl. ¶ 28. The Office of SBIC Operations' conclusion "that the $10 million capital infusion . . . would not provide any meaningful benefit to the Licensee," AR 1656-1657, 1739, is thus unsupported by the Administrative Record. SBA's reliance on its Investment Committee notes from February 16, 2012 and the memorandum from the previous day is also unavailing; as Mr. Peterson explains, the rejection of the BDC Transaction and the subsidiary conclusion that such a massive infusion of capital would not benefit ELK is based on Mr. Salgado's classification of ELK as a mature fund needing intensive oversight, a conclusion that also lacks any support in the record. *See* Peterson Decl. ¶¶ 29, 34-36.

cure notices.  ELK Mem. at 8.  Discovery could fill this gap in the Administrative Record on this important and disputed issue.

Fifth, SBA disputes ELK's claim that the Record reflects no evidence concerning why the March 6, 2012 letter and SBA's subsequent correspondence imposed a "cure" that SBA knew was impossible to meet.  Here too, SBA misstates and fails to address ELK's argument.  SBA insists that, in a March 8, 2012 email, ELK acknowledged that it "was capable of meeting" the requirement that it cure within fifteen days.  Opp. at 15-16.  In that same email, ELK indicated that it would do so by obtaining binding commitments from investors to invest in Ameritrans, which would then be invested into ELK.  But SBA responded to this email by letter on March 13, 2012.  AR 1833-34.  And that letter required ELK to invest $10-15 million in actual funds within eight days in order to cure, which was impossible given the conditions that SBA had imposed.  *See* Feinsod Decl. ¶ 53; AR 1832.  The record reflects no explanation as to why SBA imposed those severe cure requirements.  *See* ELK Mem. at 8.

Finally, SBA apparently does not dispute that it was required to produce risk rating worksheets for each of ELK's quarterly financial statements, but contends that the worksheets have ***no bearing*** on ELK's condition of capital impairment.  Opp. at 16.  SBA likewise asserts that ELK does not argue that other worksheets should have been included in the Administrative Record.  *Id.*  But ELK does not concede that the worksheets have no relevance to ELK's motion for discovery.  To the contrary, those documents are highly relevant.  SBA assigned ELK an "intensive" rating which, as Mr. Peterson explains, "indicates severe financial problems or serious regulatory violations."  Peterson Decl. ¶ 36.  And the memorandum recommending ELK's transfer to Liquidation did so based in part on ELK's purported history of financial difficulties and regulatory compliance problems.  *See id.* ¶¶ 30-36.  To the extent the prior risk

14

rating worksheets would have indicated that ELK previously had a normal rating, such evidence would help show that that memorandum was rife with "factual errors and erroneous conclusions" that were slanted in order to support ELK's referral to Liquidation. *Id.* ¶ 29.  The risk rating worksheets' omission from the Administrative Record further illustrates why discovery is necessary here.

## II.     ELK IS ENTITLED TO DISCOVERY ON ITS CONSTITUTIONAL CLAIMS

### A.     ELK Is Entitled to Discovery To Address Its Due Process Claim That It Was Entitled to But Did Not Receive a Decision by an Unbiased Decisionmaker

In its opening memorandum, ELK cited cases from this Court noting that "a court's review of a constitutional claim" is an "exception[ ]" to the rule that "the focal point for judicial review should be the administrative record already in existence," *Nat'l Med. Enters., Inc. v. Shalala*, 826 F. Supp. 558, 565 n.11 (D.D.C. 1993), *aff'd*, 43 F.3d 691 (D.C. Cir. 1995), and that extra-record evidence could be considered even though it was "not before the agency upon administrative review," *Rydeen v. Quigg*, 748 F. Supp. 900, 906 (D.D.C. 1990).  *See* ELK Mem. 11-12; *see also Porter v. Califano,* 592 F.2d 770, 780-81 (5th Cir. 1979).  SBA offers no substantive response to that precedent.  Nor could it.  As the government itself previously argued in its brief in *National Medical Enterprises*, a court's review of agency action is not limited to the administrative record in constitutional cases.  *See* Brief of Appellee at 50, No. 93-5247 (D.C. Cir. Jan. 10 1995) ("The district court properly denied plaintiff's motion to strike the Booth Declaration based on the exception concerning presentation of a constitutional claim:  In reviewing a constitutional claim to an agency's decision, a court may make an independent assessment of the facts and the law and may consider additional affidavits which were not before the agency upon administrative review" (internal quotation marks and alteration omitted)).  As these cases—and the government's former position—demonstrate, whether this Court should

order discovery on ELK's constitutional claims is a separate inquiry from whether ELK is entitled to discovery on its APA claims.

Citing out-of-circuit case law, SBA nonetheless contends that "[a] court is not . . . required to grant discovery requests just because a plaintiff in an APA case has asserted a constitutional violation." Opp. at 23.  That is a red herring.  ELK does not contend that it is entitled to discovery "just because" it has asserted constitutional claims in addition to its APA claims.  Rather, ELK contends that it is entitled to discovery on its due process claims to further uncover SBA's impermissible bias against corporate evergreen SBICs.  These claims implicate distinct constitutional values.  Due process renders "a biased decisionmaker constitutionally unacceptable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *see also Adair v. Solis*, 742 F. Supp. 2d 40, 63 (D.D.C. 2010), *aff'd*, 473 F. App'x 1 (D.C. Cir. 2012).[5]  And the very nature of a claim of agency bias is such that it is almost impossible to definitively prove it absent additional discovery:  "Bias, if any, is likely to be found in documents not part of the record, if any, which demonstrate the 'real' reason for the decision at issue."  *Grill v. Quinn*, No. CIV S-10-0757, 2012 WL 174873, at *5 (E.D. Cal. Jan. 20, 2012).

_____

[5] SBA's out-of-circuit cases are readily distinguishable.  In *Slockish v. United States Federal Highway Administration*, No. CV-08-1169, 2011 WL 7167042 (D. Or. Sept. 21, 2011), the court stated that "***discovery should be allowed***," under the APA, and then made the unremarkable statement that "it is unnecessary to also allow discovery on the remaining constitutional claims beyond the scope of discovery permissible under the APA."  *Id.* at *19 (emphasis added).  In *Charlton Memorial Hospital v. Sullivan*, 816 F. Supp. 50 (D. Mass. 1993), the court did not address case law from this district expressly concluding that a court's review of a constitutional claim provides an exception to the general rule that "the focal point for judicial review should be the administrative record."  *Nat'l Med. Enters., Inc.*, 826 F. Supp. at 565 n.11.  And in *Harvard Pilgrim Health Care of New England v. Thompson*, 318 F. Supp. 2d 1 (D.R.I. 2004), the court cited no case law whatsoever.  *See id.* at *12-13.  None of these cases involved a situation where, as here, case law from that very district distinguishes between constitutional and APA claims; the agency itself has admitted to the unwritten policy that is the object of discovery; and a former high-level official in the agency acknowledged the existence and application of an unwritten policy within the agency reflecting bias against the plaintiff.

That bias, moreover, has been exposed through newfound facts not before the Court when it decided ELK's preliminary injunction motion.  Not only does ELK now offer a declaration from a former SBA official that "another motivation factored in the decision to deny the CN Transaction and ultimately to transfer ELK to the Office of Liquidation."  *See* Cibolski Decl. ¶ 14.  SBA has also admitted to bias—even though no relevant statute or regulation discriminates between evergreen and limited-life SBICs.  *See* Answer ¶ 88; *see* pp. 5, 7-8, *supra*. Discovery in these circumstances would plainly not be a "fishing expedition."  Opp. 25.  To the contrary, these facts provide a strong showing of bias demonstrating that discovery is warranted to develop ELK's claim that SBA violated ELK's due process rights, including the right to an unbiased decisionmaker.

**B.** **ELK's Proposed Discovery Is Narrowly Tailored**

SBA argues that discovery is not available for ELK's constitutional claims because of purported faults in its discovery requests.  Opp. at 23-25.  SBA does not, however, contend that ELK's discovery requests are flawed with respect to its APA claims.  SBA's argument therefore only applies to ELK's discovery based on its constitutional claims.

Even as to that argument, SBA's contentions all miss the mark.  SBA repeatedly invokes Federal Rule of Civil Procedure 56(d) to argue that ELK must meet a heightened burden to justify discovery on its constitutional claims.  *See* Opp. 23-25.  Rule 56(d) provides that a nonmovant may seek discovery on summary judgment by showing, through "affidavit or declaration," that "it cannot present facts essential to justify its opposition" to summary judgment. Fed. R. Civ. P. 56(d).  But that provision is irrelevant here.  ELK does not seek discovery pursuant to Rule 56(d).  ELK seeks discovery pursuant to Rule 26(d)(1).  *See* ELK Mem. at 1 ("Pursuant to Rule 26(d)(1) . . .").

SBA cites no precedent to support its position that Rule 56(d) somehow plays a role in this Court's inquiry.  And the numerous cases allowing discovery in these circumstances, *see* pp. 4-5, *supra*, unsurprisingly do not discuss Rule 56(d) (or its predecessor, Rule 56(f)), which is "intended to prevent railroading a non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *Milligan v. Clinton*, 266 F.R.D. 17, 18 (D.D.C. 2010) (citations omitted).  It is, to put things mildly, ironic that SBA invokes Rule 56(d) at the same time it seeks to prevent ELK from having the opportunity to make even limited discovery.

Because Rule 56(d) does not apply here, SBA's contention that ELK has not shown how the discovery it seeks is essential to respond to SBA's motion for summary judgment on its constitutional claims is irrelevant.  In any event, SBA's characterization of ELK's discovery requests as seeking to "simply rehash old ground," Opp. at 24, is incorrect.  ELK's interrogatories and five narrowly drawn document requests satisfy any potentially relevant legal standard because they are carefully tailored to elicit information uniquely within SBA's knowledge concerning ELK's defenses to SBA's summary judgment motion.

As to the Interrogatories, Interrogatories 2-5 simply pose inquiries concerning the claims of bias which Mr. Peterson and Mr. Cibolski have already identified.  They ask, for example, whether ELK was liquidated "at least in part because of its status as a perpetual state of life corporate SBIC," as well as request that SBA identify any documents reflecting the unwritten policy ELK has alleged.  *See* Dkt. # 45-2, Plaintiff's Interrogatories to Defendant SBA ("Interrogatories") at 6.  Interrogatories 6-9 request information concerning SBA's treatment of SBICs that faced a condition of capital impairment, were issued a standard cure letter, were given more than fifteen days to cure, or were ultimately referred to Liquidation.  Interrogatories

at 7.  These Interrogatories focus on SBA's treatment of SBICs—including limited-life SBICs—that are otherwise similarly situated to ELK and are highly relevant to whether SBA's treatment of ELK was motivated by bias.

The other Interrogatories are similarly relevant and narrowly tailored.  Interrogatories 10-13 make narrow inquiries concerning SBA's rejection of the CN Transaction, including SBA's abrupt and unexplained cancellation of a scheduled meeting with ELK to discuss the Transaction in June 2011, and the grounds for SBA's ultimate rejection of it.  Interrogatories at 7-8.  Interrogatories 14 and 15 seek clarification of the remarks made by Mr. Salgado in his voicemail message to Mr. Feinsod on February 16, 2012 (including Mr. Salgado's claim that the BDC Transaction was plagued by "uncertainties within the term sheet" and that he could not understand why an investor would want to invest in a distressed SBIC).  *Id.* at 8.

The remaining Interrogatories largely ask SBA to provide any non-privileged information related to any meetings or deliberations concerning ELK that are not reflected in the Administrative Record.  *See* Interrogatories at 8-9.  Similarly, ELK's five document requests only seek documents identified in response to the Interrogatories that are not already included in the Administrative Record compiled by SBA.  *See* Dkt. # 45-2, Plaintiff's Request for Production of Documents to SBA at 3.

In short, the information ELK seeks is highly relevant and easy to compile.  And SBA's opposition to ELK's discovery requests nowhere argues that it would be overly burdensome to respond to them.  Rather, SBA argues that it should not have to respond because it has supplied the complete Administrative Record.  Opp. at 23-24.  But the existence of an Administrative Record does not affect ELK's entitlement to discovery on its constitutional claims.  *See* pp. 15-17, *supra*.  Besides, for the reasons set forth above, evidence adduced since this Court's decision

denying ELK's motion for a preliminary injunction (including the declarations from Mr.

Cibolski and Mr. Peterson, as well as SBA's own admissions) support ELK's request for extra-

record discovery.[6]

## CONCLUSION

The motion for leave to serve discovery should be granted.

---

[6] On September 17, 2012, this Court issued an Order providing that "[t]he parties are STRONGLY encouraged to meet and confer in an attempt to resolve their disagreement or narrow the areas of dispute requiring the Court's resolution." Pursuant to this Court's Order, the parties spoke by telephone on September 21. During that call, SBA took the position that it would consider responding to a pared down set of document requests and interrogatories, but only if ELK agreed not to test those responses through depositions. ELK responded by letter on September 24 that it would consider limiting the scope of the document requests and interrogatories, but not at the expense of forfeiting all depositions. SBA responded by taking the view that, in light of ELK's position, it did not appear that the parties would be able to come to any mutual agreement on the scope, if any, of discovery. ELK cannot agree with SBA's position that ELK should be barred from taking depositions. "Depositions are the factual background where the vast majority of litigation actually takes place." 7 Moore *et al.*, *Moore's Federal Practice* § 30.02[2], at 30-14 (3d ed. 2012) (quoting *Hall v. Clifton Precision*, 150 F.R.D. 525, 531 (E.D. Pa. 1993)). Depositions could be necessary to further inquire into the responses SBA provides to the document requests and interrogatories. For example, if SBA denies the existence of a policy to exterminate corporate SBICs, deposing the appropriate SBA official could test that denial. "The very purpose of the deposition discovery is to test the extent of the deponent's knowledge and claims of ignorance." *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, No. 86-2542, 1987 WL 11994, at *2 (D.D.C. May 26, 1987). The parties are, unfortunately, at an impasse.

Dated:  October 11, 2012

/s/ William S. Heyman
William S. Heyman (D.C. Bar # 47345)
Don P. Foster (admitted *pro hac vice*)
Offit Kurman, P.A.
8171 Maple Lawn Blvd, Suite 200
Fulton, Maryland  20759
(443) 738-1593 (phone)
(443) 738-1535 (facsimile)
wheyman@offitkurman.com
dfoster@offitkurman.com

Respectfully submitted,

/s/ Justin V. Shur
Justin V. Shur (D.C. Bar # 973855)
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
jshur@mololamken.com